**James U. STEELE, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Dale Bell, Intervenor.**

**No. 84–1176.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 1, 1985.

Decided Aug. 23, 1985.

Rehearing En Banc Granted Oct. 31, 1985.[*]

---

[*] Opinion and judgment vacated.

Alan B. Kaufman, New York City, with whom Stuart A. Shorenstein, New York City, was on brief, for appellant.

C. Grey Pash, Jr., Counsel, F.C.C., Washington, D.C., with whom Daniel M. Armstrong, Associate Gen. Counsel, F.C.C.,

Washington, D.C., was on brief, for appellee.

Rudolph L. Ennis, Knoxville, Tenn., was on brief for intervenor Dale Bell.

Before TAMM, WALD and SCALIA, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

Dissenting opinion filed by Circuit Judge WALD.

TAMM, Circuit Judge:

The Federal Communications Commission (the "Commission") extends preferential treatment to female applicants for FM radio stations in comparative evaluation proceedings. Appellant James U. Steele contends that this policy discriminates on the basis of sex in violation of the United States Constitution and is an agency action that is arbitrary, capricious, or otherwise unlawful under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982) (the "APA"). We do not reach the constitutional question because we find that in adopting the female preference policy, the Commission exceeded its statutory authority. We therefore declare the policy invalid, reverse the agency's award of the construction permit to Bell, and remand the case for further proceedings consistent with this opinion.

## I. Background

In 1981, appellant Steele and intervenor Bell filed mutually exclusive applications for construction permits for new FM broadcast facilities on channel 224A (92.7 MHz) at St. Simon's Island, Georgia.[1] Channel 224A will be the first local broadcast outlet on St. Simon's Island, a small resort community located off the coast of southeast Georgia.

Steele is originally from the South and plans to reside on St. Simon's Island as full-time general manager of the station if he is awarded the construction permit. He holds B.S. and M.A. degrees in communications and has more than twenty years of broadcast experience in a variety of management and non-management positions at radio and television stations. Steele has never had an ownership interest in any broadcast facility or any other medium of mass communications.

Bell is also from the South and moved to St. Simon's Island approximately one year before filing her application. She does not have a college degree, and her broadcast experience consists of four months at station WUFE–(AM), Baxley, Georgia, a facility owned by her father, Mr. Farnell O'Quinn. Bell holds stock in three family-owned cable television systems located in Georgia,[2] but she has committed to divest herself of these interests upon grant of her application. She plans to operate the new station as its full-time general manager. Her husband, Dewayne—who also owns the transmitter site and has committed joint funds for the project—has agreed to serve as his wife's full-time assistant general manager at the station.

---

1. Originally, four candidates filed applications for a permit. One applicant dropped out at its own request in late 1981. The Commission denied the application of Cannon's Point Broadcasting Company, the third applicant, at the time it denied Steele's. The application of Cannon's Point, however, was deemed inferior to both Steele's and Bell's by both the Administrative Law Judge ("ALJ") and the Review Board. Cannon's Point has not appealed the Commission's decision or intervened in this case. Steele and Bell are thus the only remaining viable candidates for the permit.

2. All together, the O'Quinn family owns, controls, or has applied for (1) four broadcast stations within a 30-mile radius; (2) eight stations within a 100-mile radius; (3) nine stations in the State of Georgia; and (4) three cable television systems also located in Georgia. Citing these and other factors, Steele requested the addition of real-party-in-interest and concentration-of-control issues in order to challenge the propriety of granting a female preference in this case. Joint Appendix ("J.A.") at 43–54. The ALJ denied Steele's request. The Review Board affirmed, but cautioned the O'Quinn family that its activities were "operating at the outer limits of what is permissible without an evidentiary hearing concerning regional concentration." J.A. at 32.

An Administrative Law Judge ("ALJ") conducted comparative hearings to determine which applicant would best serve the public interest. The ALJ found that the relative advantages and disadvantages of each application were essentially offsetting but granted Bell's application because her qualitative enhancement as an integrated female owner with past local residence overcame Steele's enhancement for past broadcast experience.

Like the ALJ, the Review Board on appeal found that the merits of Steele's and Bell's applications were close. It found no differences between the two on the three factors of character, proposed program service, and past broadcast experience as an owner. Steele was accorded a "very slight comparative coverage preference" over Bell under the "efficient use of frequency" factor. The Board found the parties equal on the "primary objective" of "diversification of control of the media of mass communications" because the Board accepted Bell's representations that she would sell her cable stock upon grant of her application and that the substantial broadcast interest of Bell's family, while unrefuted, should not be attributed to her in the circumstances of this case. The Board also found Bell and Steele were equal with respect to the "quantitative" measure of integration of ownership and management. The "qualitative enhancements" awarded under the integration factor, then, became pivotal, and the Board concluded that Bell's "credits for 100% female integration and past local residence" were superior to Steele's "credits for previous broadcast experience and proposed future residence." Joint Appendix ("J.A.") at 20–33. In its conclusion, the Board stated that "[u]nder the comparative circumstances of this case, Bell's 100% female integration is *decisively important.*" J.A. at 33 (emphasis added). The Commission affirmed the Review Board's decision without opinion, J.A. at 34–35, but later characterized its denial of review in this case as one "where enhancement credit for female ownership proved to be *decisive.*" *Horne Industries, Inc.,* 98 F.C.C.2d 601, 603 n. 3 (1984). Steele appeals the Commission's decision.

## II. THE COMMISSION'S AUTHORITY

### A. *The Scope of Review*

The question confronting this court is whether the Commission exceeded its statutory authority by adopting a gender-based preference for comparative broadcast license proceedings. The APA, 5 U.S.C. § 706(2)(C) (1982), states that a "reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be in excess of statutory jurisdiction, authority, or limitations or short of statutory right." In determining whether an action exceeds an agency's statutory authority, the reviewing court's task "necessarily entails a firsthand judicial comparison of the claimed excessive action with the pertinent statutory authority." *Western Union Telegraph Co. v. FCC,* 541 F.2d 346, 354 (3d Cir.1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977).

The Federal Communications Act of 1934 authorizes the Federal Communications Commission to regulate "communication by wire and radio so as to make available ... to all the people of the United States a rapid, efficient, Nation-wide, and worldwide wire and radio communication service." 47 U.S.C. § 151 (1982). The Act further empowers the Commission to prescribe the qualifications of radio station operators and issue broadcasting licenses "as public convenience, interest, or necessity requires." 47 U.S.C. § 303 (1982).

The public interest standard of the Act is not susceptible to precise definition. *See FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940) (the standard "is as concrete as the complicated factors for judgment in such a field of delegated authority permit"). At the same time, however, the Supreme Court has recognized that Congress did not intend by the Act "to transfer its legislative power to the unbounded discretion of the regulatory body." *FCC v.*

*RCA Communications, Inc.,* 346 U.S. 86, 90, 73 S.Ct. 998, 1002, 97 L.Ed. 1470 (1953). *See also National Broadcasting Co. v. United States,* 319 U.S. 190, 216, 63 S.Ct. 997, 1009, 87 L.Ed. 1344 (1943) (public interest standard " 'not to be interpreted as setting up a standard so indefinite as to confer an unlimited power' ") (quoting *Federal Radio Commission v. Nelson Brothers Co.,* 289 U.S. 266, 285, 53 S.Ct. 627, 636, 77 L.Ed. 1166 (1933)). Thus, while the Commission is entitled to deference in deciding how the public interest will best be served, a reviewing court must ensure that the Commission's action " 'is based on consideration of permissible factors and is otherwise reasonable.' " *FCC v. WNCN Listeners Guild,* 450 U.S. 582, 594, 101 S.Ct. 1266, 1274, 67 L.Ed.2d 521 (1981) (quoting *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 793, 98 S.Ct. 2096, 2111, 56 L.Ed.2d 697 (1978)).

Under the Commission's *Policy Statement on Comparative Broadcast Hearings,* 1 F.C.C.2d 393 (1965), the public interest standard encompasses as one of its primary goals "a maximum diffusion of control of the media of mass communications, generally referred to as diversification." 1 F.C.C.2d at 394. *See West Michigan Broadcasting Co. v. FCC,* 735 F.2d 601, 604–06 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1392, 84 L.Ed.2d 782 (1985). Diversification seeks not only to avoid undue concentration of media outlets in the hands of a few individuals or entities but also to promote diversity of programming and viewpoint. The promotion of diverse sources of information through diversification of media ownership is thus well established as an integral part of the Commission's public interest mandate. *See Citizens Communications Center v. FCC,* 447 F.2d 1201, 1213 n. 36 (D.C.Cir.1971), *clarified,* 463 F.2d 822 (D.C.

Cir.1972). The Supreme Court has recognized on several occasions the connection between diversity of ownership and the diversity of ideas and expression that is the basis of the first amendment. *See, e.g., Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969); *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945); *see also* H.R.Rep. No. 765, 97th Cong., 2d Sess. 40 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 2237, 2261, 2284 ("The nexus between diversity of media ownership and diversity of programming sources has been repeatedly recognized by both the Commission and the courts."). Thus, a vital component of the Commission's public interest determination has been consideration of "the extent to which the ownership of the media will be concentrated or diversified by the grant of one or another of the applications before it." *Citizen's Communications Center,* 447 F.2d at 1213 n. 36.

**B. *The Commission's Minority Preference Program***

Based on the diversification rationale, this court in *TV 9, Inc. v. FCC,* 495 F.2d 929 (D.C.Cir.1973), *cert. denied,* 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974), held that "when minority ownership is likely to increase diversity of content, especially of opinion and viewpoint, merit should be awarded" to minority applicants in comparative hearings. 495 F.2d at 938. Since *TV 9,* the Commission, the courts, and Congress have recognized that fostering minority ownership, when it is fully integrated with station management, "is an important public policy objective within the FCC's 'public interest' mandate." *West Michigan,* 735 F.2d at 607 (citations omitted).[3]

---

**3.** In *West Michigan,* we extended the rationale of *TV 9* to sanction the Commission's general policy of awarding special preferences to minority applicants who will participate fully in station management in comparative licensing proceedings. The appellants in *West Michigan* had argued that under *TV 9,* the only legitimate reason to promote minority ownership was to

provide programming responsive to the previously unmet needs of a local minority population. We rejected this narrow reading of *TV 9* because the goal of increasing diversity is a vital part of the Commission's public interest mandate on both a local *and* a national level. Thus, we concluded that the FCC had properly grant-

In conformity with this policy, the Commission has developed a wide-ranging and comprehensive set of administrative devices and procedures designed to enhance minority ownership opportunities. The Commission now recognizes minority ownership and participation as an affirmative factor that enhances an applicant's proposal in the comparative evaluation process. *See WPIX, Inc.*, 68 F.C.C.2d 381, 410–12 (1978). The Commission also offers tax incentives for the sale of broadcast facilities to minorities and special "distress sale" relief enabling licensees designated for a hearing on character qualifications issues to apply for assignment of their licenses to minority purchasers. *Statement of Policy on Minority Ownership of Broadcast Facilities*, 68 F.C.C.2d 979 (1978). In addition, the Commission's revised clear channel rules provide preferential treatment to minority-controlled candidates for new AM stations. *Clear Channel AM Broadcasting*, 78 F.C.C.2d 1345, *recons.* 83 F.C.C.2d 216 (1980), *aff'd sub nom., Loyola University v. FCC*, 670 F.2d 1222 (D.C.Cir.1982).

The Commission has also implemented a new, congressionally-mandated mass media lottery, or random selection scheme, as an alternative to the comparative hearing process. *Random Selection Lotteries*, Second Report and Order, 93 F.C.C.2d 952 (1983). The lottery system includes, consistent with express statutory authorization, special preferences for racial and ethnic minorities. *See* 47 U.S.C. § 309(i)(3)(A), (C)(iii) (1982); H.R.Rep. No. 765, 97th Cong., 2d Sess. at 40–41, 43–45 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News at 2284–85, 2287–89. Under our decisions, the Commission's authority to adopt minority preferences even apart from the lottery process—at least where such preferences are tied to minority participation in the management of broadcast facilities—is clear. *See TV 9, Inc.; West Michigan.*

### III. THE FEMALE PREFERENCE POLICY

■ In contrast to the Commission's more comprehensive policy towards minorities, women receive preferential treatment only in comparative hearings for FM licenses. Although women do not receive the same degree of merit as would comparable minority applicants, the preference may still be outcome determinative.

The Communications Act does not mention a female preference policy [4] nor has

---

ed a substantial enhancement to a minority FM station applicant. 735 F.2d at 609–11.

**4.** In contrast to its endorsement of preferences for racial and ethnic minorities, Congress has been at best ambivalent about a female ownership preference. In 1981, Congress amended the Communications Act to empower the Commission to grant radio broadcasting licenses through the use of a system of random selection or lottery. Omnibus Budget Reconciliation Act of 1981, PUB.L. No. 97–35, 95 Stat. at 736–37 (the "1981 Amendment"). The 1981 Amendment required the Commission to adopt rules and procedures to ensure that "groups or organizations, or members of groups or organizations, which are underrepresented in the ownership" of broadcast facilities be granted significant preferences. The accompanying conference report explained that

> [i]t is the firm intention of the conferees that ownership by minorities, such as blacks and hispanics, as well as by women, and ownership by other underrepresented groups, such as labor unions and community organizations, is to be encouraged through the award of significant preferences in any such random selection proceeding.

H.R.REP. No. 208, 97th Cong., 1st Sess. 897 (1981), *reprinted in* 1981 U.S.Code Cong. & Ad. News 396, 1259 (the "1981 Conference Report").

The Commission refused to implement the lottery system permitted by the 1981 Act, however, because it feared that preferences based solely on an applicant's race or sex would be found unconstitutional. *See* Random Selection Lotteries, First Report and Order, 89 F.C.C.2d 257, 281 (1982). In response, Congress shortly thereafter amended section 309(i) and significantly narrowed the scope of the preference language. Section 309(i)(3)(A) now provides that

> The Commission shall establish rules and procedures to ensure that, in the administration of any system of random selection ... used for granting licenses or construction permits for any media of mass communications, significant preferences will be granted to applicants or groups of applicants, the grant to which of the license or permit would increase the diversification of ownership of the media of mass communications. To further diversify the ownership of the media of mass communications, an additional significant preference shall be granted to any applicant con-

any court ordered its implementation. The Commission itself has never given plenary consideration to the issue.[5] Rather, the policy had its genesis in a 1978 Review Board decision upon reconsideration in *Gainesville Media, Inc.*, 70 F.C.C.2d 143 (Rev.Bd.1978). The Board stated that

> [i]n our [original decision in this comparative case] we held that since there was no evidence in the record of the extent of female ownership in the mass media in Gainesville, we had no basis on which to conclude that such participation would achieve a public interest benefit. Upon further reflection, we now believe the better course is to consider female ownership and participation, despite the absence of record evidence regarding the ownership situations at other stations.

*Id.* at 149. This "further reflection," however, did not alter the outcome of the proceeding, nor did the Board offer any reason, policy, fact, finding, or citation to explain or support the sudden and gratuitous announcement of its new preferential policy.[6]

Twelve days after its reconsideration opinion in *Gainesville* issued, the Board released its decision in *Mid-Florida Television Corp.*, 70 F.C.C.2d 281 [69 F.C.C.2d 607] (Rev.Bd.1978), *set aside on other grounds*, 87 F.C.C.2d 203 (1981). In *Mid-Florida*, the Board attempted to supply the rationale missing from *Gainesville:*

> We hold that merit for female ownership and participation is warranted upon essentially the same basis as the merit given for black ownership and participation, but that it is a merit of lesser significance. The basic policy considerations are the same. Women are a general population group which has suffered from a discriminatory attitude in various fields of activity, and one which, partly as a consequence, has certain separate needs and interests with respect to which the inclusion of women in broadcast ownership and operation can be of value. On the other hand, it is equally obvious that the need for diversity and sensitivity reflected in the structure of a broadcast station is not so pressing with respect to women as it is with respect to blacks—

---

trolled by a member or members of a minority group.
"Minority groups" are defined as "Blacks, Hispanics, American Indians, Alaska Natives, Asians and Pacific Islanders." 47 U.S.C. § 309(i)(3)(C)(ii) (1982). Significantly, women are no longer identified as a specific group meriting a special preference in the revised statutory scheme.

Unlike the minority preference, therefore, we can find no clear congressional endorsement of the Commission's female preference policy. *Cf. West Michigan*, 735 F.2d at 612–13 ("Congress made clear its approval of the Commission's [minority] policy."). Indeed, Congress's *withdrawal* of the authority to award preferences to "underrepresented" groups such as women in the random lottery system might even be interpreted as indicating congressional *disapproval* of gender-based preferences in the comparative hearing process. We do not mean to suggest, of course, that explicit congressional approval is necessary to the validity of *all* Commission policies implemented under the public interest standard. Manifestations of congressional intent, however, are particularly relevant when we are called upon to review a Commission action that impacts on constitutionally protected interests. *Cf. Kent v. Dulles*, 357 U.S. 116, 129, 78 S.Ct. 1113, 1115, 2 L.Ed.2d 1204 (1958) (right to travel is a constitutionally protected liberty interest,

and court will not readily infer that Congress gave Secretary of State unbridled discretion to grant or withhold it).

5. The Commission has, however, considered the question of its authority to adopt a female preference in its random lottery system. *See* Random Selection Lotteries, Third Notice of Proposed Rulemaking, 95 F.C.C.2d 432 (1983). Noting that it had not as yet "developed a complete record as to the nexus between past discrimination and women's ownership of broadcast facilities," the Commission in the *Third Notice* sought comments as to "whether the Commission is itself competent to make such findings, or whether Congressional action is required." *Id.* at 439.

6. Only five months earlier, the Board had reached a contrary conclusion in its original disposition of this case:

> While the Commission does have a stated goal of promoting equal opportunities in employment for minorities and women, its goals in this area apply to employment practices of licensees and permittees. Generally, they do not relate to ownership, and they do not provide a basis for a preference in a comparative hearing.

70 F.C.C.2d at 66.

women have not been excluded from the mainstream of society as have black people. To the extent that any significant population group is more fully integrated into the society as a whole, the need to promote ownership-participation by the members of that group in broadcasting diminishes.

70 F.C.C.2d at 326. In neither *Gainesville* nor *Mid-Florida* did the Board make clear whether the policy's primary purpose was to rectify past discrimination or to increase diversity of programming. The "separate needs and interests" language suggests that more female owners will enhance programming diversity. The language regarding female versus black exclusion from the mainstream and the lesser merit awarded females as a result point toward compensation for past discrimination. No further discussion of the basis for the female preference, however, appears in any subsequent decision of the Board or the Commission. The Commission now claims that it adopted the female preference solely because increased female ownership of broadcast facilities, like increased minority ownership, will promote the public interest in fostering diversity of viewpoint in the mass media.

To determine whether the rationale underlying the minority preference applies to a female ownership preference, we must examine the assumptions and premises upon which the minority preference rests. That task, however, is not simple for two reasons. First, the assumptions and premises themselves have never been critically examined by the courts, Congress, or the Commission. Second, to the extent that they are discernible, they run counter to the fundamental constitutional principle that race, sex, and national origin are not valid factors upon which to base government policy.

The minority preference rests on the assumptions that first, membership in an ethnic minority causes members of that minority to have distinct tastes and perspectives and, second, that these differences will consciously or unconsciously be reflected in distinctive editorial and entertainment programming. The validity of the first of these assumptions is not obvious on its face. There is no reason to assume, for example, that an Italian station owner would primarily program Italian operas or would eschew Wagner in favor of Verdi. Similarly, it is questionable whether a black station owner would program soul rather than classical music or that he would manifest a distinctively "black" editorial viewpoint. Indeed, to make such an assumption concerning an individual's tastes and viewpoints would seem to us mere indulgence in the most simplistic kind of ethnic stereotyping.

Moreover, quite apart from the factual validity of this assumption, it is contrary to one of our most cherished constitutional and societal principles. That principle holds that an individual's tastes, beliefs, and abilities should be assessed on their own merits rather than by categorizing that individual as a member of a racial group presumed to think and behave in a particular way. *See, e.g., Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967) ("Over the years, this Court has consistently repudiated '[d]istinctions between citizens solely because of their ancestry' as being 'odious to a free people whose institutions are founded upon the doctrine of equality.'") (quoting *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943)).

With respect to the second assumption, one would think that station owners—motivated primarily by the desire to turn a profit—would be more influenced in their programming decisions by the tastes, interests, and perspectives of the listening audience than by those tastes and perspectives perhaps attributable to their own ethnic backgrounds. For example, a hispanic station owner serving a predominantly white, middle-class suburban audience, aged thirty-five and up, would not necessarily program Latin or Caribbean music. To suggest that these dubious, ethnically-determined tastes will outweigh the economic

imperative of what the audience wants to hear therefore strikes us as more than a little implausible.

In sum, the best that one can say is that the validity of these assumptions is a matter of degree or "reasonableness." *See TV 9*, 495 F.2d at 938 (minority preference rests on a "reasonable expectation, not advance demonstration" that minority ownership and management, when integrated, will increase programming diversity). Whatever the merit of these assumptions as applied to cohesive ethnic cultures, it simply is not reasonable to expect that granting preferences to women will increase programming diversity. Women transcend ethnic, religious, and other cultural barriers. In their social and political opinions and beliefs, for example, women in fact appear to be just as divided among themselves as are men. Therefore it is not reasonable to expect that a woman would manifest a distinctly "female" editorial viewpoint. The editorial perspectives of the *Washington Post* and the *New York Times,* for example, seem close to identical, yet the former is published by a woman and the latter is not. Perhaps the Commission means to suggest, however, that if more women owned stations, they would program softer, more "feminine" music. Indeed, it is not clear which stereotype of women the Commission meant to indulge in adopting the female preference.

As we have noted, the constitutional prohibition of discrimination on the basis of race or sex is founded on the presumption that a person should be judged as an individual rather than as a member of a particular group, and that no assumptions can or should be made about an individual's bent of mind merely because of a birth characteristic such as sex or race. Yet the Commission attempts to justify its policy solely by reversing this presumption and asserting precisely the opposite. Perhaps because the presumption is so questionable as a matter of fact and so offensive as a matter of principle, the Commission has been unable to offer any evidence other than statistical underrepresentation to support its bald assertion that more women

station owners would increase programming diversity. Instead, a few Commission employees without any evidence, reasoning, or explanation, gratuitously decreed one day that female preferences would henceforth be awarded. *See Gainesville Media, Inc.,* 70 F.C.C.2d 143 (Rev.Bd.1978). Presumably, the Board thought that it was a Good Idea and would lead to a Better World. Contrary to the Commission's apparent supposition, however, a mandate to serve the public interest is not a license to conduct experiments in social engineering conceived seemingly by whim and rationalized by conclusory dicta. Were we to hold otherwise, we would be conceding that by simply identifying as statistically underrepresented a discrete social group, the Commission could grant members of that group preferential treatment in the name of diversity of programming. The question then would become not whether the Commission should have a special program for women, but why it should not also have one for the aged, the handicapped, labor unions, community organizations, and other "underrepresented" groups. To read the public interest mandate so broadly would in effect confer on the Commission the unbounded discretion that the courts have repeatedly held it does not possess. As the Supreme Court has stated, the criterion of the "public interest, convenience or necessity," while giving the Commission wide discretion, "is not to be interpreted as setting up a standard so indefinite as to confer an unlimited power." *See National Broadcasting Co. v. United States,* 319 U.S. 190, 216, 63 S.Ct. 997, 1009, 87 L.Ed. 1344 (1943); *see also FCC v. RCA Communications, Inc.,* 346 U.S. 86, 90, 73 S.Ct. 998, 1002, 97 L.Ed. 1470 (1953).

We therefore hold that the Commission exceeded its authority under the Federal Communications Act by adopting a female preference in comparative broadcast proceedings, and we therefore declare the policy invalid. Accordingly, the Commission's decision is reversed, and this case is remanded to the Commission for further proceedings consistent with this opinion.

*So ordered.*

WALD, Circuit Judge, dissenting:

This case presents an important statutory question: Whether the Federal Communications Commission (the "FCC" or the "Commission") acted within its public interest mandate in deciding to award merit for the integration of female ownership and management in comparative licensing proceedings. While I agree with the majority that the FCC's public interest mandate does not give the Commission roving discretion to do good deeds, I disagree emphatically that this is a case in which it merely indulged a "whim" to implement a "Good Idea" in hopes of making a "Better World." *See* Maj.Op. at 1199. Rather, the Commission's decision to award female integration merit is, in my view, clearly within its public interest mandate as construed by both this court and the Supreme Court. The Commission has not acted to promote the general welfare of women or to better their role in society. To the contrary, the Commission's actions are predicated entirely on its unique interest in and mandate to provide the best practicable service to the listening and viewing public by promoting diversity of programming and viewpoint through diversity of ownership and participation. Although the majority acknowledges awareness of weighty precedent establishing both that the Commission is entitled to deference in determining how the public interest is best served, *see* Maj.Op. at 1195, and that the promotion of diversity of content through diversification of ownership and participation is a vital, integral part of the FCC's public mandate, *see* Maj.Op. at 1195, the majority, nonetheless, shuns even token adherence to such precedent. Instead, the majority supplies us with the wholly unsatisfactory substitute of its own conclusory views as to the foolishness of the Commission's chosen means of promoting diversity. In my view, the reasoning of the majority's opinion simply cannot be reconciled with this court's prior precedent. Analyzed under conventional principles of judicial review—legal reasoning based on precedent—the FCC's decision to award comparative merit for female in-

tegration must be affirmed. On that basis, I respectfully dissent.

## I. THE FCC'S ROLE IN PROMOTING DIVERSITY OF VIEWPOINT

Limited availability of broadcast frequencies and attendant problems of interference with broadcast signals led Congress to enact the Communications Act of 1934 (the "Communications Act") delegating to the FCC broad authority to allocate broadcast licenses in the "public interest." *See FCC v. National Citizens Comm. for Broadcasting (NCCB)*, 436 U.S. 775, 795, 98 S.Ct. 2096, 2112, 56 L.Ed.2d 697 (1978); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 375–77, 387–88, 89 S.Ct. 1794, 1798–99, 1805, 23 L.Ed.2d 371 (1969); *National Broadcasting Co. v. United States*, 319 U.S. 190, 210–18, 63 S.Ct. 997, 1006–10, 87 L.Ed. 1344 (1943). "The avowed aim of the Communications Act of 1934 was to secure the maximum benefits of radio to all the people of the United States." *National Broadcasting Co.*, 319 U.S. at 217, 63 S.Ct. at 1010. Over the years, the Supreme Court has "repeatedly emphasized the Commission's judgment regarding how the public interest is best served is entitled to substantial judicial deference." *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981). Noting that the Act does not define the term "public interest, convenience, and necessity," the Court has characterized this public interest standard as "a supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy." *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940). Accordingly, the Court has assiduously declined to substitute its own views of communications policy for the views of the Commission. *See National Broadcasting Co.*, 319 U.S. at 218, 63 S.Ct. at 1010.

While according substantial deference to the Commission's discretion to determine the best means of maximizing the benefits of the broadcast media to the public, the

Court has recognized that " 'the "public interest" standard necessarily invites reference to First Amendment principles,' *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 122 [93 S.Ct. 2080, 2096, 36 L.Ed.2d 772](1973), and, in particular, to the First Amendment goal of achieving 'the widest possible dissemination of information from diverse and antagonistic sources,' *Associated Press v. United States*, [326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945) ]." *FCC v. NCCB*, 436 U.S. at 795, 98 S.Ct. at 2112; *see also Red Lion Broadcasting Co.*, 395 U.S. at 390, 89 S.Ct. at 1806 (Listeners have first amendment right "to receive suitable access to social, political, esthetic, moral, and other ideas and experiences."). Thus in *FCC v. NCCB*, the Court found that the Commission's license allocation policy of attributing "primary significance" to "diversification of control of the media of mass communications" to be consistent with both the public interest standard and the first amendment goal of promoting diversity of viewpoint. 436 U.S. at 795, 98 S.Ct. at 2112.

The Commission established "diversification of control" as a factor of "primary significance" in its *Policy Statement on Comparative Broadcast Hearings*, 1 F.C.C.2d 393, 394 (1965) (*"Policy Statement "*), which sets forth the Commission's criteria for choosing between competing license applicants. The Commission identified the two primary objectives of the comparative licensing process as choosing the applicant who will insure the "maximum diffusion of control of the media of mass communications" and who will provide the "best practicable service to the public." *Id.* The Commission further noted that "[s]ince independence and individuality of approach are elements of rendering good program service, the primary goals of good service

and diversification of control are also fully compatible." *Id.*[1]

In *Citizens Communications Center v. FCC*, 447 F.2d 1201 (D.C.Cir.1971), *clarified*, 463 F.2d 822 (D.C.Cir.1972), this court clearly recognized the Commission's duty to promote diversity of both ownership and content stating:

> Since one very significant aspect of the "public interest, convenience, and necessity" is the need for diverse and antagonistic sources of information, the Commission simply cannot make a valid public interest determination without considering the extent to which the ownership of the media will be concentrated or diversified by the grant of one or another of the applications before it. The Supreme Court itself has on numerous occasions recognized the distinct connection between diversity of ownership of the mass media and the diversity of ideas and expression required by the First Amendment.

*Id.* at 1213 n. 36 (citations omitted). While the promotion of diversity of programming and viewpoint is well established as an integral aspect of the Commission's public-interest mandate in keeping with the first amendment tradition, the Commission is, nonetheless, limited in the means it may use to promote diversification lest it run afoul of the same first amendment tradition. Clearly, the Commission cannot promote content diversity directly by mandating that licensees broadcast specific programs or particular moral, social or political viewpoints. *See, e.g., FCC v. NCCB*, 436 U.S. at 796–97, 98 S.Ct. at 2112–13 (defining and measuring diversity is difficult without "making qualitative judgments objectionable on both policy and First Amendment grounds") (quoting *NCCB v. FCC*, 555 F.2d 938, 961 (D.C.Cir.

1. Six specific factors related to the achievement of these policy goals are specified in the *Policy Statement* as considerations in a comparative licensing hearing: (1) diversification of control; (2) full-time participation in station operation by owners; (3) proposed program service; (4) past broadcast record; (5) efficient use of frequency; and (6) character. *Policy Statement,* 1 F.C.C.2d at 394–99. The Commission, however, made explicit that its enumeration of these six specific factors was "not intended to preclude the full examination of any relevant and substantial factor." *Id.* at 399; *see also TV 9, Inc. v. FCC,* 495 F.2d 929, 936–37 (D.C.Cir.1973), *cert. denied,* 418 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974).

1977)). Similarly, it would be objectionable on both policy and first amendment grounds for the Commission to choose among competing license applicants directly on the basis of their social, political, religious, or moral beliefs. *See, e.g., National Broadcasting Co.,* 319 U.S. at 226, 63 S.Ct. at 1014 ("Congress did not authorize the Commission to choose among applicants upon the basis of their political, economic or social views...."). Thus the Commission must seek to achieve diversity of programming and viewpoint primarily through structural means such as promoting diversity of ownership and control—the sources of programming and viewpoint—rather than direct content regulation. *See, e.g.,* H.R.Conf.Rep. No. 765, 97th Cong., 2d Sess. 43, U.S.Code Cong. & Admin.News pp. 2237, 2287 (1982) ("It is hoped that this approach to enhancing diversity through such structural means [i.e. promoting ownership by underrepresented groups by granting preference to such groups in the lottery system] will in turn broaden the nature and type of information and programming disseminated to the public."); *see also Statement of Policy on Minority Ownership of Broadcasting Facilities,* 68 F.C.C.2d 979, 981 (1978) ("[A]ffecting programming by means of increased minority ownership ... avoids direct government intrusion into programming decisions.").

It is true that the FCC's "fairness doctrine" directly promotes content diversity to some extent by requiring licensees to provide media access to more than one side of controversial issues. *See Red Lion Broadcasting Co.,* 395 U.S. at 367, 89 S.Ct. at 1794. This court has specifically stated, however, that the FCC's fairness doctrine *does not undercut* the Commission's rationale for placing significant reliance on the criterion of diversity of control in allocating licenses; instead, diversity of control is such an "important objective that the Commission must be accorded discretion in choice of measures for its fulfillment." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 860 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29

L.Ed.2d 701 (1971). Specifically the court stated:

> The Commission need not be confined to the technique of exercising regulatory surveillance to assure that licensees will discharge duties imposed on them, perhaps grudgingly and perhaps to the minimum required. It may also seek in the public interest to certify as licensees those who would speak out with fresh voice, would most naturally initiate, encourage and expand diversity of approach and viewpoint.

*Id.* We reiterated this view in *Citizens Communications Center,* 447 F.2d at 1213 n. 36, adding:

> As new interest groups and hitherto silent minorities emerge in our society, they should be given some stake in and chance to broadcast on our radio and television frequencies.

*Id.* The views of the court expressed in *Greater Boston* and *Citizens Communications Center* foreshadowed a developing recognition of the need to promote greater ownership and control of the media by minorities and other groups significantly underrepresented in the broadcast industry in order to further the aims of the Communications Act and the first amendment.

## II. DEVELOPMENT OF A MINORITY MERIT POLICY IN COMPARATIVE HEARINGS

A commitment to increasing minority control and participation in the broadcast industry has been unequivocally embraced by this court. In *TV 9, Inc. v. FCC,* 495 F.2d 929 (D.C.Cir.1973), *cert. denied,* 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974), the Commission had accepted the FCC Review Board's determination that the "Communications Act, like the Constitution, is color blind," and thus black ownership could not be an independent comparative factor between license applicants absent a showing on the record that such ownership would result in some public interest benefit. *Id.* at 936 (quoting *Mid-Florida Television Corp.,* 33 F.C.C.2d 34, 268 (1970)). This court found this rationale unsatisfactory stating:

The thrust of the public interest opens to the Commission a wise discretion to consider factors which do not find expression in constitutional law. Inconsistency with the Constitution is not to be found in a view of our developing national life which accords merit to Black participation among principals of applicants for television rights. However elusive the public interest may be it has reality. It is a broad concept, to be given realistic content.

*Id.* Accordingly, the court held that merit should be accorded for minority ownership and participation:

We hold ... that when minority ownership is likely to increase diversity of content, especially of opinion and viewpoint, merit should be awarded. The fact that other applicants propose to present the views of minority groups in their programming, although relevant, does not offset the fact that *it is upon ownership that public policy places primary reliance with respect to diversification of content, and that historically has proven to be significantly influential with respect to editorial comment and the presentation of news.*

*Id.* at 938 (footnotes omitted) (emphasis added) (citing *Special Project, Media and the First Amendment in a Free Society*, 60 Geo.L.J. 867, 871, 896, 1006 (1972).[2]

In *Garrett v. FCC*, 513 F.2d 1056 (D.C. Cir.1975), this court remanded a decision of the Commission because it could not be harmonized with the principle articulated in *TV 9*. The court emphasized that:

The entire thrust of *TV 9* is that black ownership and participation together are themselves likely to bring about programming that is responsive to the needs of the black citizenry, and that that "reasonable expectation," without "advance demonstration," gives them relevance.

*Id.* at 1063 (footnotes omitted).

Following this court's decisions in *TV 9* and *Garrett,* the Commission explicitly stated its policy with respect to the consideration of merit for minority ownership and participation in the context of comparative licensing hearings. *See WPIX, Inc.,* 68 F.C.C.2d 381, 411–12 (1978). Noting that this court in *TV 9* stated that minority ownership and participation "is a consideration relevant to a choice among applicants of broader community representation and practicable service to the public, 495 F.2d [at] 937," the Commission concluded that minority participation would be considered a "plus factor" in determining which applicant was awarded a preference for the integration of ownership and management. *See supra* note 1 (delineating the relevant factors of consideration in a comparative licensing hearing). In its *Policy Statement on Comparative Licensing Hearings,* the Commission declared that integration of ownership and management was a factor of "substantial importance" not only in securing the best practicable service but also in complementing the objective of diversification.[3] Thus in *WPIX, Inc.,* the Commission concluded:

---

**2.** The court explicitly stated that no *per se* quota system was being required or recommended. *TV 9,* 495 F.2d at 937–38. Moreover, in a supplemental opinion in response to a petition for rehearing *en banc,* the court clarified its intended meaning of the term "merit": "'merit' ... is not a 'preference' but a plus-factor weighed along with all other relevant factors in determining which applicant is to be awarded a preference." *Id.* at 941 n. 2. The view that such factors as race, sex, or national origin, which the individual is powerless to change, could not be a basis for awarding a merit enhancement was expressed by several judges on the court, including Judge Tamm, but this view failed to prevail. *See* Statement of Circuit Judges MacKinnon, Robb, and Tamm, and Statement of Circuit Judge Wilkey, 495 F.2d at 942 (stating reasons as to why they would grant the motion for rehearing *en banc*). The fact that this view failed in *TV 9* apparently presents no obstacle, in the majority's view, to once again asserting it as support for the conclusion that the Commission may not award merit on the basis of female ownership and participation. *See* Maj.Op. at 1198–99.

**3.** As noted, the Commission identified diversification of control of the mass media as a factor of "primary significance" constituting a primary objective of the licensing scheme. *Policy Statement,* 1 F.C.C.2d at 394. In considering the diversification of control factor, the Commission looks only at the extent of the license applicants' ownership interests in other broad-

Since the diversification criterion only concerns the adverse impact flowing from other media ownership, an applicant with no such interests engenders no public interest detriment, suffers no deficiency, and simply remains at its original level for comparative purposes regardless of its other characteristics. On the other hand, integration of ownership and management is a criterion, under our best practicable service objective, which deals with an applicant's positive attributes—such as community involvement, broadcast experience, and proposed participation in the station's operation—that tend to lift the applicant above the starting point for comparative purposes. Because minority ownership and participation is also an affirmative factor enhancing the applicant's proposal and raising its level in the comparative evaluation, we have concluded that it can be best considered in this and future cases under the integration of ownership and management criterion. Our conclusion in this regard is strengthened by lan-

guage used in *TV 9, Inc.*, 495 F.2d at 941, where the Court of Appeals specifically said that the merit to be accorded in that case was warranted because the minority involvement was combined with participation in the operation of the proposed station. *Cf. Garrett Broadcasting Service (WEUP) v. FCC*, 513 F.2d [1056] 1057, at 1063 and fn. 52 (1975).

*WPIX, Inc.*, 68 F.C.C.2d at 411–12 (footnote omitted).[4]

This court again, only a year ago, in *West Michigan Broadcasting Co. v. FCC*, 735 F.2d 601 (D.C.Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1392, 84 L.Ed.2d 782 (1985), upheld the Commission's policy of awarding qualitative merit for integration of minority ownership and management against both statutory and constitutional challenges. With respect to the statutory challenge, the court reiterated its views expressed in *TV 9* that the rationale of promoting program diversity, on both the local and national level,[5]—"a rationale

cast stations and other media of mass communication. *Id.* In considering the integration factor, on the other hand, the Commission looks at the extent that station owners will be participating in the day-to-day operation of the station. The Commission is primarily interested in full-time participation and awards credit on the basis of degree of the ownership interest of the participating owner and the position he or she will occupy, with policymaking positions such as general manager, station manager, and program director carrying the most weight. *Id.* at 395.

Although the Commission places primary reliance on the quantitative degree of integration of ownership and management (i.e., the total percentage of ownership interest to be held by applicants proposing to occupy full-time management positions), it also considers certain individual attributes of the applicants as qualitative enhancements which may tip the balance if applicants have equal degrees of quantitative integration. Specifically the Commission stated in the *Policy Statement* that participating owners' value would be increased to varying degrees by local residence, previous broadcast experience, and participation in community affairs. *Id.* at 396.

4. As the majority notes, *see* Maj.Op. at 1196, the Commission has additionally chosen to implement "minority preferences" in contexts outside

of comparative hearings, determined solely on the basis of ownership without reference to participation in management. In its *Statement of Policy on Minority Ownership of Broadcasting Facilities*, 68 F.C.C.2d at 982, the Commission stated that, although the Commission had begun to afford comparative merit to license applicants where minority owners were to participate in station operations in accordance with this court's pronouncements in *Citizens Communications Center* and *TV 9*, "the continuation of an extreme disparity between the representation of minorities in our population and in the broadcasting industry requires further Commission action." The Commission noted that "while today's actions are limited to minority ownership because of the weight of the evidence on this issue, other clearly definable groups, such as women, may be able to demonstrate that they are eligible for similar treatment." *Id.* at 984 n. 22. The granting of preferences with respect to distress sales, tax certificates, the clear channel rules, and lotteries, all involve a more substantial, absolute preference than the enhancement merit allowed on the integration factor in comparative proceedings. Thus, the Commission may be justified in proceeding more slowly with respect to granting these absolute preferences to women.

5. The court specifically rejected West Michigan's argument that the policy behind promot-

that is derived from the First Amendment and at the heart of the Communications Act"—fully supports and legitimizes the FCC's granting of enhancement merit in comparative hearings to proposals integrating ownership and management by minorities underrepresented in the broadcast media. *Id.* at 610–11. With respect to the contention that the FCC's use of an enhancement for minority status violates constitutional equal protection principles, the court held that "a number of factors show that the FCC's plan easily passes constitutional muster...." *Id.* at 613. Specifically the court relied first on the fact that the minority enhancement involves no set quota but is merely one plus factor in "a competitive multi-factor selection system designed to obtain a diverse mix of broadcasters." *Id.* Nonminorities remain freely able to compete for licenses.[6] Second, the court referred to Congress' clear recognition in passing the lottery statute, *see infra* pp. 1210–1212, of the extreme underrepresentation of minorities and their perspectives in the broadcast media. *West Michigan,* 735 F.2d at 614.

In sum, this court has not only demonstrated an enduring support for the Commission's policy of awarding merit for minority ownership and participation in the interest of increasing diversity of content and representation of minority perspectives but, in effect, it has mandated that the FCC institute such a policy. In light of that precedent, I find the majority's conclu-

sion that it is beyond the Commission's statutory authority to award an analogous enhancement merit for female ownership and participation, predicated on the same rationale as the minority enhancement, to be quite remarkable. But even more remarkable is the majority's failure to explain the patent inconsistency between its reasoning and prior precedent or, for that matter, to provide any legal or factual foundation whatsoever for its breathtakingly iconoclastic judgment that such a credit is beyond the FCC's statutory authority.

### III. ENHANCEMENT MERIT FOR FEMALE OWNERSHIP AND PARTICIPATION

Since 1978, the Commission has included female ownership and participation among the qualitative enhancement factors considered with respect to the integration factor. *See supra* notes 1 & 3. As with the minority enhancement, merit is awarded only to the extent the woman owner will hold a policymaking position and is proportionate to the extent of her quantitative ownership interest. *See New Continental Broadcasting Co.,* 96 F.C.C.2d 544, 546–47 (Rev.Bd.1983); *North Carolina Radio Serv.,* 92 F.C.C.2d 621, 623 (Rev.Bd.1982). Qualitative enhancement merit for female integration cannot overcome a competing applicant's advantage for quantitative integration. *See Alexander S. Klein, Jr.,* 86 F.C.C.2d 423, 428–29 (1981); *supra* note 6.

---

ing minority ownership and participation articulated in *TV 9* was to assure the availability of programming which was specifically responsive to unmet minority needs in the community. *West Michigan,* 735 F.2d at 608–12. The court stated that the *TV 9* opinion clearly recognized that increasing diversity of content on both the local and national level was a vital part of the FCC's public interest mandate. *Id.* at 611. The court then quoted from the Commission's policy statement on minority ownership to the effect that:

> [The underrepresentation of minority prospectives] is detrimental not only to the minority audience but to all of the viewing and listening public. Adequate representation of minority viewpoints in programming serves not only the needs and interests of the minority community but also enriches and educates the non-minority audience.

*Id.* at 612 (quoting *Statement of Policy on Minority Ownership of Broadcast Facilities,* 68 F.C. C.2d at 980–81).

**6.** The FCC policy is clear that while minority ownership is entitled to significant weight in the comparative process, it is not a *per se* comparative determinative but rather is weighed in the balance with the other enhancements relating to local residence, previous broadcast experience, and civic participation. Credit is given in proportion to the quantitative ownership involved, and a quantitative integration gap cannot be overcome by qualitative attributes. *See, e.g., Radio Jonesboro, Inc.,* 96 F.C.C.2d 1106, 1111–12 (Rev.Bd.1984); *New Continental Broadcasting Co.,* 96 F.C.C.2d 544, 545–48 (Rev.Bd.1983); *Van Buren Community Service,* 87 F.C.C.2d 1018, 1022 (Rev.Bd.1981), *review dismissed,* 50 Rad. Reg.2d (P & F) 1433 (1982).

Moreover, the merit awarded for female integration is considered along with the other qualitative enhancement factors, and under FCC precedent is of less decisional significance than minority integration. *See Waters Broadcasting Corp.*, 91 F.C.C.2d 1260, 1266 (1982), *aff'd sub. nom. West Michigan Broadcasting Co. v. FCC*, 735 F.2d 601 (D.C.Cir.1984); *Radio Gaithersburg, Inc.*, 72 F.C.C.2d 820, 829 (Rev.Bd. 1979); *Mid-Florida Television Corp.*, 69 F.C.C.2d 607, 652 (Rev.Bd.1978).

As the majority notes, the FCC's policy of awarding women enhancement merit for integration in comparative proceedings developed out of Review Board decisions.[7] Specifically, in *Mid-Florida Television Corp.*, 69 F.C.C.2d 607 (Rev.Bd.1978), *set aside on other grounds*, 87 F.C.C.2d 203 (1981), the Board stated:

> We hold that merit for female ownership and participation *is warranted upon essentially the same basis as the merit given for black ownership and participation, but that it is a merit of lesser significance. The basic policy considerations are the same.* Women are a general population group which has suffered from a discriminatory attitude in various fields of activity, and one which, partly as a consequence, has certain separate needs and interests with respect to which the inclusion of women in broadcast ownership and operation can be of value.

*Id.* at 652 (emphasis added). The majority asserts that the Board's statement in *Mid-Florida* fails to specify whether the policy's primary purpose was to rectify past discrimination or to increase diversity of programming. *See* Maj.Op. at 1197. I strongly disagree. It patently adopts the latter rationale. The Board unequivocally states that the merit for female ownership and participation is warranted on the same basis as the merit for minority ownership and participation. Just preceding its discussion of the award of merit for female integration, the Board clearly recognized that the rationale for the minority merit espoused by both this court and the Commission, *see supra* pp. 1195–1197, is that of promoting diversity of programming and viewpoint which is a vital aspect of the FCC's public interest mandate:

> We do not have a broad license to promote the general public welfare. Our proper concern being the interest of the listening and viewing public in the best practicable service, we do not believe that the Commission may foster black ownership *per se* without regard to its likely impact upon program service. As the Court of Appeals held in *TV 9, Inc.*, it is a proper concern of the Commission to foster diversity of program viewpoints, and stock ownership and meaningful participation by minority persons is reasonably related to that public interest concern.

*Mid-Florida Television Corp.*, 69 F.C.C.2d at 651 (citations and footnote omitted). The Board in still another passage explicitly referred to the desirability of female ownership and participation in terms of increasing diversity of viewpoint and program content.[8] *Id.* Past and present societal discrimination is cited as a reason why women are a particular group which

---

7. Contrary to the majority's implication, however, this does not undercut the validity of the policy. The Commission is free to grant review and reverse the Review Board. Section 5(c)(3), 47 U.S.C. § 155(c)(3), provides that "Any order, decision, report, or action made or taken pursuant to ... delegation, unless reviewed ..., shall have the same force and effect ... as orders, decisions, reports, or other actions of the Commission." It appears clear that the Review Board's decisions accurately reflect the Commission's policy views. *See, e.g., Horne Industries*, 94 F.C.C.2d 815, 822–24 (Rev.Bd.1983), *review denied*, 56 Rad.Reg.2d (P & F) 665, 668 (1984).

8. The Board held that female diversity of ownership and participation remained deserving of merit even if other stations in the community possessed women owners or managers to some degree but noted that:

> There may be situations where an all-female (or, indeed, all minority) applicant should not be entitled to merit, *e.g.*, in comparison with an applicant with a varied makeup in a community where all existing stations are female (or minority) owned. But we think it may safely be left to an opposing party to demonstrate the existence of such a situation.

*Mid-Florida Television*, 69 F.C.C.2d at 651 n. 86.

may have, as the Board put it, "separate needs and interests" which are underrepresented in the broadcast media. A fair reading of the decision as a whole leads to only one conclusion: merit is awarded to increase the overall diversity of perspectives represented not to rectify past discrimination. Thus, in my view, the majority toys with the true record on the female integration merit by intimating that the Commission has only now adopted a definitive rationale for the merit. *See* Maj.Op. at 1197–98 ("The Commission now claims that it adopted the female preference solely because increased female ownership of broadcast facilities, like increased minority ownership, will promote the pubic interest in fostering diversity of viewpoint in the mass media.").

But even after grudgingly accepting that the merit for female, like minority, ownership and participation is predicated on the rationale that promoting diversity of ownership and participation will increase diversity of programming and viewpoint, the majority proceeds with ill-advised alacrity to find the Commission's decision to award such merit beyond its statutory authority. The majority reaches this conclusion by determining that the rationale underlying *both the minority and female comparative merits*—namely that promoting diversity of ownership and participation will promote diversity of programming and viewpoint—is essentially fallacious. In so doing, it conveniently sweeps under the rug the fact that this court's decisions in *TV 9, Garrett,* and *West Michigan* were squarely predicated on the diversity rationale. *See supra* pp. 1195–1197. Moreover, the diversity rationale has been unequivocally embraced by the Commission, Congress, and the Supreme Court.[9]

In its *Statement of Policy on Minority Ownership of Broadcasting Facilities,* 68

F.C.C.2d at 981, the Commission stated its belief that increasing the representation of minority views could be achieved through increasing minority ownership and participation and cited this court's pronouncements on the subject as support for its view. In enacting the lottery statute, *see infra* pp. 1210–11, the conferees stated:

The nexus between diversity of media ownership and diversity of programming sources has been repeatedly recognized by both the Commission and the courts. For example, in promulgating its "concentration of control" regulations, the Commission stated that "the fundamental purpose of this facet of the multiple ownership rules is to promote diversification of program and service viewpoints as well as to prevent any undue concentration of economic power contrary to the public interest." Amendment of Sections 3.35, 3.240, and 3.636, Report and Order, 18 F.C.C. 288 (1953), aff'd, *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956).... In *TV 9, Inc. v. FCC,* a landmark case dealing with comparative merit for minority applicants, the court stated "that it is upon ownership that public policy places primary reliance with respect to diversification of content, and that historically has proved significantly influential with respect to editorial comment and the presentation of news." 495 F.2d 929, 938 (D.C.Cir.1973), *cert. denied,* 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974).

H.R.Conf.Rep. No. 765, 95th Cong., 2d Sess. 40–41 (1982). Finally, in *NAACP v. FPC,* 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976), the Supreme Court in referring to the rationale underlying the FCC's equal opportunity employment regulations stated:

its view that the assumptions underlying the diversity rationale, as characterized by the majority, are invalid. However, I see no citations of or references to any authorities supporting the majority's opinions. I daresay I find this court's prior precedent and the rather weighty consensus of opinion as to the validity of the diversity rationale more persuasive.

---

**9.** The majority apparently feels no compulsion to abide by the weight of authority upholding the legitimacy of the diversity rationale because in its view the assumptions and premises underlying the rationale "have never been critically examined by the courts, Congress, or the Commission." *See Maj.Op.* at 1198. As I read its opinion, however, the majority merely asserts

These regulations can be justified as necessary to enable the FCC to satisfy its obligation under the Communications Act of 1934 ... to ensure that its licensees' programming fairly reflects the tastes and viewpoints of minority groups.

*Id.* at 670 n. 7, 96 S.Ct. at 1812 n. 7 (citations omitted). Thus, whether the majority likes it or not, the assumption that promoting diversity in ownership and participation will promote diversity in programming and viewpoint has been unequivocally accepted and embraced by this court, the Commission, Congress, and the Supreme Court.

Not only does the majority fail to acknowledge the weight of precedent upholding the assumption that promoting diversity of ownership and management will promote diversity of content, it totally mischaracterizes the nature of the assumption, reducing it to a simplistic, one-dimensional notion that members of particular groups may all be expected to program in a uniform, predictable manner: Italians will program Italian opera; Blacks will program soul music; and women will program soft, "feminine" music. *See* Maj.Op. at 1198, 1199. To the contrary, an integral part of the far more complex and sophisticated diversity rationale on which the Commission proceeded is the belief that increased participation of minorities and women will help prevent the perpetuation of just such simplistic stereotypical portrayals of minorities and women as those attributed to the Commission by the majority.

In the late 1970's, the Civil Rights Commission published two reports which detailed the stereotypic and biased image of minorities and women in the broadcast media and asserted the need to remedy the problem by actively seeking to increase the participation of minorities and women in the broadcast industry. *See* Window Dressing on the Set: Women and Minorities in Television, A Report of the United States Commission on Civil Rights (1977) (cited by the Commission in its *Statement of Policy on Minority Ownership*, 68 F.C. C.2d at 980 n. 9); Window Dressing on the Set: an Update, A Report of the United

States Commission on Civil Rights (1979). The Commission found women most often portrayed as sex symbols, wives or mothers. *See generally Window Dressing On the Set: Women and Minorities in Television, supra* at 4–48; *see also* Stanley, *Federal Communications Law and Women's Rights: Women in the Wasteland Fight Back*, 23 Hastings L.J. 15 (1971). In its update, the Commission found that while the proportion of women featured in the media had increased, to an increasing degree they were being presented primarily in "jiggly shows," such as *Charlie's Angels* and *Three's Company. See Window Dressing on the Set: An Update, supra,* at 5 (citing proposed program titles such as *The Cheerleaders, California Coed, Legs, Centerfold, Wayward Girls,* and *The Beach Girls*). Sexism has been identified as particularly rampant in the media's portrayal of women in commercials:

> [O]ne characteristic stands out in many commercials: women never leave the kitchen. They are in there day and night. They chase tornedos [sic], they engage in heated arguments with doves, they have floor washing contests, Men from Glad, Ivory, and Bold fly in from outer space or rise from the sink, to consult with them on household chores. They require constant coaching by men in how to do their floors, their dishes, their woodwork, their wash....

Stanley, *supra,* at 49 n. 160 (quoting Transcript of Conference between N.Y. Advertising Agencies and NOW, Jan. 15, 1971, at 10). Finally it has been noted that even shows purportedly catering to the "woman viewer" have been criticized for failing to deal with matters of concern to working women such as professional opportunities, child care, sexual harassment on the job, or equal pay; instead they focus exclusively on cooking, sewing, fashion and beauty hints. *Id.* at 17. "One suspects that such 'women's programs' are in fact fashioned by men according to their own conception of what women want and need." *Id.*

The point of increasing ownership and participation of underrepresented groups,

such as minorities and women, is not to get some specific preordained women's programming or black programming, but to ensure that the varying viewpoints, perspectives, and issues of distinct relevance to these groups are fairly represented in the media. As the majority quite correctly states, women are not uniform in their choices of lifestyle, or their political, social or moral beliefs but, I submit, neither are blacks. The point is not that these groups have some cohesive, collective viewpoint. Certainly Phyllis Schlafly and Eleanor Smeal differ on most issues related to women; what they share, however, is their awareness that women as a group are currently facing critical issues. The nexus between diversity of control and diversity of content concerns such things as the selection of topics for coverage in news, editorials, and programming, the emphasis accorded to the issues, and the fairness with which the issues are presented, as well as, the consideration given to the manner in which various groups are portrayed in the media. *Cf. Greater Boston Television Corp.*, 444 F.2d at 860 ("There is a public interest in diversity in policy areas lit by the lantern of editorial probes, and for that matter by reportorial assignments and coverage."). Women having ownership interests and policymaking roles in the media are likely to enhance the probability that the varying perspectives and viewpoints of women will be fairly represented in the broadcast media.

In sum, the permissibility of the FCC's promoting, as an integral part of its public interest mandate, diversity of programming and viewpoint by seeking to increase diversity of ownership and participation of underrepresented groups is not only firmly grounded in precedent but also makes sense facially so long as it is not reduced to a quest for stereotypic generalizations about distinctive group viewpoints. In my view, the majority has articulated no valid basis, nor do I see any, for finding that it is *per se* beyond the statutory authority of the Commission to grant comparative merit for female ownership when integrated with management.[10] Thus the only remaining question is whether the Commission acted arbitrarily, capriciously, or abused its discretion in determining that women, like minorities, are a group which warrant such a merit.

Admittedly the FCC might have done a more thorough job of setting forth its rationale, in the first instance, for granting comparative merit for female ownership and participation than the Board's brief statement of reasoning in *Mid-Florida*.[11] If, however, this court believed that the

10. While purporting not to reach the constitutional issue, the majority states that the awarding of merit based on race, sex or national origin runs counter to the constitutional principle that these are not valid factors upon which to base government policy. *See* Maj.Op. at 1198–99. This court has already rejected this premise with respect to race. *See supra* note 2; *see also West Michigan,* 735 F.2d at 613–16. Government policies based on classifications by gender are not *per se* impermissible but are subject to heightened scrutiny by the court. *See Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976) (classifications by gender must serve important governmental objectives and must be substantially related to the achievement of those objectives). Although lengthy elaboration is unnecessary since the majority does not reach the constitutional issue, it is my view that the comparative merit for female integration would easily pass constitutional muster under *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) and *Regents of University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), for basically the same reasons this court found the enhancement for minority status constitutional in *West Michigan,* 735 F.2d at 613–16.

11. I see no particular problem with the fact that the Board chose to articulate its rationale in *Mid-Florida* rather than in its reconsideration in *Gainesville Media, Inc.,* 70 F.C.C.2d 143, 149–50 (Rev.Bd.1978), where it had no impact on the outcome. Nor do I find it relevant that the Commission reversed its original position in *Gainesville. See* Maj.Op. at note 6. In its original decision, the Board refused to grant comparative merit because there was no evidence in the record as to the extent of female ownership and participation in the local market. The Board's reversal of this requirement of record evidence of the existing representativeness in the local market is consistent with its position of promoting diversity at the national as well as local level and with not requiring such evidence for the award of the minority merit. *See supra* notes 5 & 8.

FCC had failed to engage in reasoned decisionmaking, the remedy would be to remand to the Commission for further proceedings, not to *per se* declare that the decision was beyond the Commission's statutory authority no matter how comprehensive an analysis the Commission conducted in the future. In any case, even on the record before us, I believe the comparative merit for female integration can be upheld as an exercise of reasoned decisionmaking.

The FCC claims that the comparative merit for female ownership and participation is warranted on the same basis as the minority merit, but a lesser merit is warranted since women have not been excluded from mainstream society to the same extent as blacks. *See Mid-Florida*, 69 F.C.C.2d at 652. Thus, its argument runs that like minorities, women are underrepresented in the broadcast industry. Further, as a result of historical societal attitudes and prejudices, women are a distinct group with unique needs and interests. Promoting increased ownership and participation of women in the broadcasting industry is expected to enhance the probability of programming responsive to the special needs and interests of women and to increase overall diversity of viewpoint and perspective.

I do not read the majority opinion to disagree with the basic proposition that women are underrepresented in the broadcast industry. The Commission exhibited a recognition of the need to increase the participation of women in the broadcast industry when it adopted a requirement that licensees must file with the Commission specific programs designed to insure equal employment opportunities for women. *See Report and Order in Docket No. 19269*, 32 F.C.C.2d 708 (1971). Congress has also explicitly recognized the underrepresentation of women in the broadcast industry. *See* H.R.Conf.Rep. No. 765, 97th Cong., 2d Sess. 44–45 (1982), U.S.Code Cong. & Admin.News p. 2288; H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 897 (1981), U.S.Code Cong. & Admin.News p. 1259. Indeed, contrary to the majority's suggestion of congressional ambivalence, *see* Maj.Op. at 1196

n. 4, Congress has indicated its general support for the Commission's policy of awarding comparative merit to promote the ownership and participation of women in the broadcast industry. Moreover, the majority is flatly wrong to assert that Congress *withdrew* the authority of the Commission to award preferences to women in any lottery system the Commission may establish pursuant to 47 U.S.C. § 309(i)(3).

When Congress originally amended the Communications Act in 1981 to permit the Commission to grant certain licenses through a random selection process or lottery system, the new statutory language provided that the Commission "shall establish rules and procedures to ensure that, in the administration of any system of random selection . . ., groups or organizations, or members of groups or organizations, which are underrepresented in the ownership of telecommunications facilities or properties will be granted significant preferences." Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 736–37. In the accompanying conference report, the conferees stated:

> It is the firm intention of the conferees that ownership by minorities, such as blacks and hispanics, *as well as by women*, and ownership by other underrepresented groups . . . is to be encouraged through the award of significant preferences in any such random selection proceeding. These are groups which are inadequately represented in terms of nationwide telecommunications ownership, and it is the intention of the conferees in establishing a random selection process that the objective of increasing the number of media outlets owned by such persons or groups be met.

H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 897 (1981), U.S.Code Cong. & Admin. News pp. 396, 1259 (emphasis added). The Commission declined to implement a lottery system pursuant to the 1981 amendment because the statutory language was so broad as to make implementation virtually impossible. *See Random Selection/Lottery Systems, Report and Order*, 89 F.C.

C.2d 257 (1982). Specifically, the Commission stated, *inter alia,* that it was unclear whether Congress intended that preferences be granted only to groups underrepresented due to past discrimination, such as minorities *and women,* or to all underrepresented groups including labor and community organizations, and their individual members. *Id.* at 272–74.

In response Congress amended the language of the statute to its current language which reads:

> The Commission shall establish rules and procedures to ensure that, in the administration of any system of random selection ... significant preferences will be granted to applicants or groups of applicants, the grant to which of the license or permit would increase the diversification of ownership of the media of mass communications. To further diversify the ownership of the media of mass communications, an additional significant preference shall be granted to any applicant controlled by a member or members of a minority group.

47 U.S.C. § 309(i)(3)(A). The term "minority group" is defined as including "Blacks, Hispanics, American Indians, Alaska Natives, Asians and Pacific Islanders." 47 U.S.C. § 309(i)(3)(C)(ii). Thus Congress created two distinct diversity preferences, a "media ownership preference" and a "minority ownership preference," with the underlying policy objective of both being "to promote diversification of media ownership and consequent diversification of programming content." H.R.Conf.Rep. No. 765, 97th Cong., 2d Sess. 40 (1982), U.S.Code Cong. & Admin.News pp. 2237, 2284. Congress' reason for providing that these preferences be extended in any lottery system was its concern that a lottery system while expedient may sacrifice the diversification goals promoted in comparative licensing hearings: "Diversification of media ownership and information are central goals of the traditional comparative licensing process, and continued promotion of these goals should not be sacrificed merely because a lottery may be more expedient." *Id.* at 37–38. With respect to the status of women under the revised amendment, the conferees specifically stated:

> [S]uch groups as women ... which were mentioned in the legislative history of the lottery statute originally adopted ... are all significantly underrepresented in the ownership of telecommunications facilities. Such applicant groups would, of course, be eligible for both media ownership and minority preferences....

*Id.* at 44–45 (citation omitted). This hardly constitutes a withdrawal of authority to grant a female preference. Indeed it ·shows that Congress was aware of the comparative merits granted by the Commission to promote diversity of ownership and participation, and clearly indicated its desire not to lose the benefits of these merits in promoting diversity in any lottery system adopted.

It is true that the Commission has raised the issue of whether it would be constitutional for the Commission to grant women the additional significant preference accorded "minority ownership" absent a finding that their underrepresentation is due to past discrimination. *See Random Selection/Lottery Systems, Third Notice of Proposed Rulemaking,* 95 F.C.C.2d 432 (1983). First, it should be noted, however, that the preferences at issue in the lottery context are absolute preferences not merely enhancement merits. *See supra* p. 1196 n. 4. Second, regardless of whether the Commission ultimately determines to grant women the "media ownership preference" or the "minority ownership preference" or both, I submit that Congress has clearly recognized the significant underrepresentation of women in the broadcast industry and indicated its support for promoting increased ownership and participation of women in the interest of promoting diversity.

The majority, however, while not directly refuting that women are underrepresented in the broadcast industry, does claim that if women are granted an enhancement merit then the same must be done for a myriad of other underrepresented groups. *See*

Maj.Op. at 1199. The majority overlooks the fact that women comprise over 50 percent of our population and have been recognized as a unique group which has suffered from past societal discrimination and consequently has certain separate, unique needs and interests. "[W]omen are permanent members of a class by the accident of birth and are subject to a wide range of social, economic and political prejudices." Stanley, *supra*, at 46. The Supreme Court has recognized that attitudes of "romantic paternalism" have contributed to a "long and unfortunate history of sex discrimination," *see Frontiero v. Richardson*, 411 U.S. 677, 684, 93 S.Ct. 1764, 1769, 36 L.Ed.2d 583 (1973), making women a unique group and requiring that classifications by gender be given heightened scrutiny. *See Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976). Thus I hardly find it unreasonable for the Commission to single out women as a significant, underrepresented group whose participation in the broadcast industry should be promoted to assure that the media is responsive to their special needs and interests, as well as to assure that women and their varying viewpoints and perspectives will be fairly represented. *See generally*, Stanley, *supra;* Window Dressing on the Set, *supra;* Window Dressing on the Set: an Update, *supra.*

Finally both this court and the Supreme Court have made clear that it is not incumbent on the Commission to demonstrate in advance that increasing ownership and participation of women will result in a media more responsive to women's needs and perspectives; the Commission's reasonable expectation is sufficient.[12] This court in *TV 9*, noting that such advance demonstrations or assurances are not required for the favorable consideration of other factors such as local residence, stated: "Reasonable expectation, not advance demonstration, is a basis for merit to be accorded relevant factors." 495 F.2d at 938. *See also Garrett*, 513 F.2d at 1063 ("[B]lack ownership and participation together are themselves likely to bring about programming responsive to the needs of the black citizenry, and that that 'reasonable expectation,' without 'advance demonstration,' gives them relevance.") (quoting *TV 9*, 495 F.2d at 937–38). Analogously, the Supreme Court has held:

[N]otwithstanding the inconclusiveness of the rulemaking record, the Commission acted rationally in finding that diversification of ownership would enhance the possibility of achieving greater diversity of viewpoints. As the Court of Appeals observed, "[d]iversity and its effects are ... elusive concepts, not easily defined let alone measured without making qualitative judgments objectionable on both policy and First Amendment grounds." ... In these circumstances, the Commission was entitled to rely on its judgment, based on experience....

*FCC v. NCCB*, 436 U.S. at 796–97, 98 S.Ct. at 2113 (quoting *National Citizens Comm. for Broadcasting v. FCC*, 555 F.2d 938, 961 (D.C.Cir.1977)) (citations omitted); *see also FCC v. WNCN Listeners Guild*, 450 U.S. at 594–95, 101 S.Ct. at 1274 ("[T]he Commission's decisions must sometimes rest on judgment and prediction rather than pure factual determinations.").

## IV. CONCLUSION

For the foregoing reasons, I believe that the Commission's policy of awarding merit for the integration of female ownership and management is well within its public interest mandate. I would, therefore, affirm the Commission's decision in this case.

---

12. The Commission's reasonable expectation in this regard resembles the Supreme Court's observation, nearly forty years ago, that female participation in the jury system is necessary if that process is to reflect " 'a cross-section of the community.' " *Ballard v. United States*, 329 U.S. 187, 191, 67 S.Ct. 261, 263, 91 L.Ed. 181 (1946).

The Court explained that while neither men nor women necessarily tend to act as a class, "the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both ... [and] a distinct quality is lost if either sex is excluded." *Id.* at 193–94, 67 S.Ct. at 264.