**LUTHERAN CHURCH–MISSOURI SYNOD, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

7. *See supra* note 1.

Missouri State Conference of Branches of the NAACP, et al., Intervenors.

No. 97–1116.

United States Court of Appeals, District of Columbia Circuit.

Sept. 15, 1998.

Before: SILBERMAN, WILLIAMS, and SENTELLE, Circuit Judges.

SILBERMAN, Circuit Judge:

The Federal Communications Commission (FCC) and the government have filed a joint petition for rehearing. Before the panel the government appeared only as an *amicus* (with a somewhat different position than the Commission). We do not, therefore, think the government can be regarded as a party, so we treat the petition as that of the Commission. The Commission offers three arguments to support its contention that our opinion unnecessarily and erroneously decided the Church's equal protection claim: that we should have granted its motion to remand without deciding the case; that if we had proceeded we were obliged to decide the Religious Freedom Restoration Act (RFRA) or free exercise claim before reaching the Church's equal protection argument; and, finally, that we should not have applied strict

scrutiny as the standard by which the Commission's Equal Employment Opportunity (EEO) rules should be judged under the Equal Protection Clause. We take up the arguments in that order.

### 1. The Remand Issue

We denied the FCC's motion to remand, presented seven weeks after oral argument. *Lutheran Church–Missouri Synod v. FCC,* 141 F.3d 344, 349 (D.C.Cir.1998). The motion was based on a "policy statement" in which the Commission purported to overrule its prior *King's Garden* decision. *See Streamlining Broadcast EEO Rule and Policies,* 13 F.C.C.R. 6322, 6323–24 (1998). That decision, it will be recalled, permitted religious broadcasters to prefer employees of that religion only if the employees were involved directly in broadcasting. *See King's Garden, Inc.,* 38 F.C.C.2d 339 (1972), *aff'd sub. nom. King's Garden, Inc. v. FCC,* 498 F.2d 51 (D.C.Cir.1974).

■ The Church had attacked *King's Garden* as inconsistent with both RFRA and the Free Exercise Clause, and the Commission's counsel claimed that the majority of Commissioners had agreed to apply that policy statement to this case retroactively if we would remand. We rejected this "last second" motion in part on grounds that a "policy statement," as Commissioner Furchtgott–Roth pointed out, does not bind the Commission to a result in any particular case. *See Pacific Gas & Elec. Co. v. FPC,* 506 F.2d 33, 38 (D.C.Cir.1974). The Commission insists we misunderstood its action; the policy statement was not *"merely "* a policy statement, it was also an order that grew out of a rulemaking that did bind the Commission. We confess that we simply have no idea as to in what administrative law category the Commission policy statement "order" falls. It

could not be a rule because no notice and comment procedure was employed, and we are aware of no proposition of administrative law that allows the assurances of individual Commissioners—even a majority—to transform a prospective enforcement policy into a retroactive rule of decision. In any event, the Commission concedes that the statement did not itself apply to this case. Instead, the Commission argues we should have remanded based on the majority of Commissioners' expressed intent to apply the new policy retroactively to this adjudicatory proceeding (notwithstanding that a petition for reconsideration directed to the policy statement has been filed before the Commission [1]), because we could thereby have avoided deciding a constitutional question. We rather doubt that this court should ever grant an agency's motion to remand after oral argument over the opposition of a petitioner. The same consideration that prevents the government from voluntarily acquiescing in a panel decision and thereafter seeking vacatur while a petition for reconsideration is pending seems applicable to such a maneuver. *See Mahoney v. Babbitt,* 113 F.3d 219 (D.C.Cir.1997). To be sure, as our colleague Judge Tatel points out, we have previously granted an FCC motion to remand in a case raising an equal protection challenge. *See Steele v. FCC,* 770 F.2d 1192 (D.C.Cir.1985), *vacated, Steele v. FCC,* No. 84–1176 (D.C.Cir. Oct. 31, 1985) (en banc) (discussed in *Lamprecht v. FCC,* 958 F.2d 382, 385 (D.C.Cir.1992)). In that case, however, the motion for remand was filed *before* oral argument *en banc* (the panel opinion had been vacated) and, more important, the Commission's motion, which indicated that it doubted the constitutionality of its own policy, was *supported* by the petitioner who had challenged the policy.[2] By contrast, in this case the FCC never indicat-

---

**1.** The Commission's attempt to characterize Commissioner Furchtgott–Roth's concern as restricted to television stations is disingenuous. The FCC cites his concurrence in the amended policy statement as addressing only the nonbinding nature of the policy with regard to television stations. It fails to mention, however, the Rule 28(j) letter its own counsel filed with the court noting that the Commissioner thought it inappropriate for the motion to remand to bind the Commissioners to vote in a particular way and

thus wished to make no representations about what sort of order should ultimately be adopted.

**2.** *See* Appellant's Response to Motion for Remand at 1, *Steele v. FCC,* No. 84–1176 (D.C.Cir. 1986). It was the intervenor, and the *amici curiae,* supporting the Commission's policy, who objected. *See* Intervenor Dale Bell's Opposition to Motion for Remand at 1; Joint Response to Motion for Remand at 1.

ed any doubt as to the constitutionality of its affirmative action/EEO policy. Still, if the Church had supported the Commission's motion in this case, we might well have ordered a remand.

The Church's position was quite understandable. It is simply not so, as the Commission contends, that if we had ordered a remand and the Commission had modified its opinion as its counsel indicated that it would, that the Church would have been granted complete relief. The Church had challenged both the *King's Garden* policy and the FCC's EEO regulations. And the regulations, as we recognized in our prior opinion, would continue to apply to the Church even if *King's Garden* were overruled. In its *Lutheran Church* order, the Commission indicated that any religious exemption would apply to the entire set of EEO regulations. But in its new policy statement, the Commission expressly disavowed that position. 13 F.C.C.R. 6322, 6325 (1998) ("Religious broadcasters will also remain subject to Sections 73.2080(b) and (c) of the Commission's Rules . . . notwithstanding any suggestion to the contrary in *Lutheran Church–Missouri Synod*, 12 F.C.C.R. 2152, 2166 n. 9 (1997)."). The Church would thus still remain obligated to exercise racial preferences within the pool of Lutheran applicants under the Commission's EEO rules. As such, modification of the *King's Garden* policy, whether pursuant to RFRA or the Commission's new policy, would not bring the Church into compliance with the EEO regulations.

The Commission claims that the Church did not actually challenge the future effect of the EEO regulations, rather just their application to it in this case and the sanctions the FCC imposed. But whenever a party challenges the regulatory basis for a sanction it necessarily challenges the future effect of the regulation. Understandably, the Church focused its fire on the Commission's reasoning in this specific case, but it nevertheless made clear that it was challenging the constitutionality of the Commission's entire EEO regulatory scheme as in violation of the Fifth Amendment.[3] Certainly that is why the Justice Department filed its *amicus* brief directed only to that issue.

### 2. The RFRA/Free Exercise Ground

■ The Commission alternatively argues that we were obliged to decide the RFRA challenge to the Commission's order before reaching any constitutional issues or even if, as we concluded, the RFRA challenge were intertwined with First Amendment free exercise concerns, we were obliged to decide that issue before we reached the Fifth Amendment question.

We find the Commission's position quite anomalous because under its preferred order of disposition of issues we would have had to decide the Fifth Amendment issue unless we decided the RFRA/free exercise issue *against* it. Just as a party ordinarily may not be heard to complain about the reasoning of a decision in its favor, *Powell v. Washington Metropolitan Area Transit Commission*, 466 F.2d 466 (D.C.Cir.1972), we think a losing party has no legal basis for claiming a case should have been decided against it on another ground. It may well be that the Commission really assumes that if we had struggled first with the RFRA/free exercise issue we would have been inclined to remand, in which case this argument is really only another way to present its remand contention.[4]

---

**3.** The Church certainly raised a general equal protection challenge in its opening brief, and we have held that an appellant has the right to amend its argument when the government makes such a shift midway through the appeal. *Dynalantic Corp. v. Department of Defense*, 115 F.3d 1012, 1015 (D.C.Cir.1997).

**4.** The Commission's citation of the Supreme Court's recent decision in *Federal Election Commission v. Akins*, —— U.S. ——, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), in support of its position is of no help. In *Akins*, the Supreme Court refused to address what we thought was a pure statutory issue. *See Akins v. Federal Election Commission*, 101 F.3d 731 (D.C.Cir.1996). Instead, the Court remanded in light of a possible constitutional issue that might arise as a result of the Federal Election Commission (FEC)'s rules defining "members." Far from avoiding the constitutional issue by deciding on statutory grounds, the Supreme Court avoided decision on the statutory claim by addressing a possible constitutional issue that had not even been raised below.

We are certainly mindful of the doctrine that counsels avoidance of constitutional issues, but as we have explained, we do not see how deciding the case on RFRA/free exercise grounds would have granted the Church complete relief. And, as we also observed in our prior opinion, the RFRA/free exercise issue is also constitutional in character. There is simply no support for the Commission's peculiar notion that some constitutional issues, like those involving the First Amendment, are less important and should be decided before Fifth Amendment claims.

### 3. Strict Scrutiny

■ It is important to recognize that the Commission's defense rests solely on its contention that strict scrutiny does not apply to its policy of seeking broadcast programming diversity through EEO employment guidelines. The Justice Department had asserted that the Commission's policy was also justified based on the Commission's legitimate interest in preventing employment discrimination and that even if strict scrutiny applied, the Commission's EEO employment guidelines met the compelling interest tests and narrow tailoring that strict scrutiny requires. Seeking rehearing (in the petition filed jointly with the Commission) the Justice Department abandoned the claim that the FCC's policy can withstand strict scrutiny. All the Commission's eggs—at least at this stage—are placed in the standard of review basket.

The Commission's essential argument is that its rule "does not *require* the station to adopt racial goals or achieve proportional representation in its workforce," (emphasis added), and therefore strict scrutiny is inappropriate. FCC Petition for Rehearing and Suggestion for Rehearing *In Banc* at 12. Moreover, the Commission insists there is no evidence in the record that this station, or any station, ever engaged in racial hiring (presumably discriminating against a nonminority).

We think that the Commission's position, accepted by our dissenting colleagues, has two logical flaws. Chief Judge Edwards insists that a regulation constitutes a racial classification only if it requires or obliges someone to exercise a racial preference. As we observed in our prior opinion, it is clear that these regulations *do* effectively oblige the Church to implement racial preferences in its hiring decisions. *Lutheran Church–Missouri Synod,* 141 F.3d at 351–52. But the degree to which the regulations require, oblige, pressure, induce, or even encourage the hiring of particular races is not the logical determinant of whether the regulation calls for a racial classification. In *Adarand,* the challenged regulations did not require or obligate would-be contractors to grant a preference to minority subcontractors. *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Rather, the regulations provided a financial incentive to bidding contractors to grant such a preference—an incentive that contractors were free (at their economic peril) to disregard. *Id.* at 205–08, 115 S.Ct. 2097. Nonetheless, the Supreme Court treated the regulations as a racial classification, and did not even pause to consider the suggestion that the absence of a *compelled* racial preference makes strict scrutiny inapposite. Because the FCC's regulations at issue here indisputably pressure—even if they do not explicitly direct or require—stations to make race-based hiring decisions, under the logic of *Adarand,* they too must be subjected to strict scrutiny. *See also Monterey Mechanical Co. v. Wilson,* 125 F.3d 702, 710 (9th Cir.1997).[5] Judge Tatel contends that the regulations do not provide "incentives" to stations to engage in race-based personnel decisions, but as we explained in our initial decision, *Lutheran Church–Missouri Synod,* 141 F.3d at 351–52, we think that assertion blinks reality.

By insisting on an "obligation or requirement" test, Judge Edwards would make the

---

5. The Ninth Circuit in *Monterey* stated that a classification constitutes a racial classification if it "authorizes or encourages" a racial preference. *Monterey Mechanical Co.,* 125 F.3d at 710 (quoting *Bras v. California Pub. Utilities Comm'n,* 59 F.3d 869, 875 (9th Cir.1995)). That a regula- tion becomes a racial classification if it "authorizes" preferences may be disputable. We need not address that question as the regulations here unquestionably "encourage" racial preferences under *Adarand.*

**492**

analytical definition of a classification depend on the degree of government pressure. Yet if the regulations "suggested" an 80% white male workforce, would there be any doubt as to the applicable standard of review? *See Monterey Mechanical Co.,* 125 F.3d at 711. Although an analysis of the degree of government pressure to grant a racial preference would no doubt be significant in evaluating whether a regulation survives strict scrutiny, it is the fact of encouragement—a fact that no one denies—that makes this regulation a racial classification.[6]

That does not mean that any regulation encouraging broad outreach to, as opposed to the actual hiring of, a particular race would necessarily trigger strict scrutiny. Whether the government can encourage—or even require—an outreach program specifically targeted on minorities is, of course, a question we need not decide. As we concluded in our prior opinion, the Commission's regulations go far beyond any nondiscriminatory outreach program. The imposition of numerical norms based on proportional representation—which is the core element to what are often referred to as affirmative action, set aside, or quota programs—is the aspect of the Commission's rule that makes it impossible for us to apply any standard of review other than strict scrutiny.[7] In other words, the regulations here must be subjected to strict scrutiny because they encourage racial preferences in hiring and as such treat people differently according to race. We of course do not claim, as Judge Tatel suggests, that all race conscious measures adopted by the government must be subjected to strict scrutiny. *See supra* n. 5.

The second logical flaw in the Commission's argument, adopted in Judge Tatel's dissent, concerns the claim that the record includes no evidence that the Church has ever employed a racial preference in its hiring decisions. Judge Tatel argues that absent such evidence strict scrutiny is inappropriate. Yet the Commission (and presumably Judge Tatel) concedes that if the regulation explicitly imposed quotas or goals strict scrutiny should apply. But one would not know at the time the quota or goal were imposed whether it would necessarily cause a preferential hiring decision. It could be contended that a goal or even a quota merely reflected a nondiscriminatory hiring pattern and therefore that an employer who met the goal or quota never actually discriminated. Therefore, if evidence of actual discrimination would not be required before applying strict scrutiny in the explicit quota/goal cases, there is no logical reason why it should be required here. In truth, such an evidentiary obligation would turn equal protection analysis inside out. Once a government program is shown to call for racial classifications, the heavy burden to justify it shifts to the government. The challenger does not have to show that the program actually caused him to discriminate in an actual case—a requirement which would expose the challenger to the risk of admitting a Title VII violation.

The Commission's evidentiary argument also overlooks the point that the Church comes before this court asserting the constitutional rights of absent third parties: the prospective non-minority applicants who will be denied equal treatment. In cases in which a litigant is accorded third party standing—which no one currently argues the Church lacks—there is simply no requirement that the litigant identify the particular individuals whose equal protection rights

**6.** The Commission suggests that even if some stations engage in "racial hiring" to avoid FCC scrutiny the employer's actions should be thought of as "unilateral," not implicating the government. We do not think that is a serious argument.

**7.** If a non-discriminatory hiring policy would necessarily yield a workforce with a racial composition that matches that of the Metropolitan Statistical Area, then it might be argued that requiring employers to examine the racial composition of their workforces is simply an anti-discrimination enforcement technique that does not implicate racial preferences. However, not only has the Commission provided no support for this proposition, but as we said in our opinion, the Commission has in fact disavowed it, saying that "we do not believe that fair employment practices will necessarily result in the employment of any minority group in direct proportion to its numbers in the community." *Lutheran Church–Missouri Synod,* 141 F.3d at 352.

have been, or will be, violated. And the Commission's proposed evidentiary obligation is flatly inconsistent with the Supreme Court's standing analysis in the affirmative action caselaw. The Court has held that the alleged victim of unequal treatment does not have to prove that the challenged policy was the "but for" cause of his injury; the claim that the litigant was denied equal treatment is sufficient to constitute Article III "injury in-fact." *See Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 664–66, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). Thus, if a non-minority prospective Church employee had challenged the constitutionality of the regulations, he would not have to submit evidence demonstrating that the Church's actual use of racial preferences (pursuant to the regulations) was the cause of his failure to be hired. It would be sufficient, for standing purposes, to show that the regulations caused him to be treated differently from minorities. That being so, we cannot understand how such a litigant would be required, in order to trigger strict scrutiny, to make a showing that the Church made use of a racial preference in his particular hiring decision. And if an individual litigant would not have to make such a showing, neither does the Church standing in his or her place for the purpose of this constitutional challenge.

The Commission *en passant* calls to our attention the proposition that "statistics can be an important source of proof in employment discrimination cases." But the Commission understandably does not link up that observation with any part of their argument. It could appear to be directed to the magnitude of government's interest, if strict scrutiny applied, but, as we have noted, the Commission does not claim that its regulations pass the strict scrutiny test. And, in any event, as we pointed out in our prior opinion, the Commission justified its EEO rule not as preventing discrimination but as achieving program diversity. It is clearly designed to place an obligation on stations that goes considerably beyond non-discrimination with respect to hiring minorities.

That brings us to the interesting dissenting opinion of the Chief Judge, who argues from Title VII disparate impact cases that what the Commission has required here is not all that different from the obligation an employer defendant has to rebut a showing of disparate impact in which proportionality is relevant. It is perhaps sufficient to respond that whatever the nature of the employer's burden under Title VII, the Commission insisted that its regulation is not based on employment diversity or anti-discrimination, but on programming diversity. It was the Justice Department that initially sought to ride both horses (which is why we observed in our opinion that "diversity" can and is being used today as a rather plastic term).

■■ We think the Chief Judge, in any event, is wrong on his broader point. Although statistics, to be sure, can be used in Title VII cases, the statute does not encourage employers to impose racial preferences in order to avoid Title VII liability. Indeed, Title VII itself specifically disclaims any intention of pressuring employers to impose racial preferences. *See* 42 U.S.C. § 2000e–2(j) (1994) ("Nothing contained in [Title VII] shall be interpreted to require any employer ... to grant preferential treatment to any individual or to any group because of [ ] race....."). Since we held that the FCC's EEO regulations, unlike Title VII, inevitably cause licensees to grant racial preferences, we disagree that the Commission could avoid the impact of our holding by merely adopting Chief Judge Edwards' suggestion—that the FCC amend the regulations to add the above quoted Title VII caveat. *See* Chief Judge Edwards' dissent at 8. For the Commission to declaim unrealistically that the regulations are not to be interpreted as requiring a preference—as Chief Judge Edwards recommends—is to simply put forward a covering fiction.

Even in Title VII disparate impact cases, quite different sorts of statistics are employed for the limited purpose of determining whether a particular sort of job requirement disadvantages minorities. Comparing the proportionality of minorities in the employer's workforce to the proportionality of

minorities in the overall population (the Metropolitan Statistical Area or MSA) is never the relevant comparison under such cases; rather, the racial composition of those holding atissue jobs is compared with the racial composition of qualified applicants or qualified persons in the *labor market. See Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) (O'Connor, J., plurality opinion). That the relevant statistical gauge is not the proportionality of minorities in the overall population is clear from the antidiscrimination rationale of Title VII—the purpose of statistical evidence is to expose possible discriminatory intent, not to establish a workforce that mirrors the racial breakdown of the MSA.

 If discrimination under Title VII were defined as non-proportionality, much of the Supreme Court's recent equal protection cases would make little sense. That is, "[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 602, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (O'Connor, J., dissenting) (citation and internal quotations omitted). Of course, in some situations unequal treatment is justified to account for past discrimination, but societal discrimination is not enough to justify imposing a racially classified remedy. *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493–94, 499, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *cf. Contractors Assoc. of Eastern Penn.,* 442 F.2d 159 (3d Cir.1971) (holding that an affirmative action program directly tied to past discrimination by construction unions did not violate Title VII). The Supreme Court has never held that non-proportionality constitutes discrimination. (The Commission itself disavowed this position. *Lutheran Church–Missouri Synod,* 141 F.3d at 352.) The Court has noted the danger that relying solely on statistical disparities as proof of discrimination under Title VII could result in the imposition of de facto quotas. *Watson,* 487 U.S. at 991–97, 108 S.Ct. 2777 (O'Connor, J., plurality opinion). You could achieve proportional representation quotas as easily by that route as by requiring them explicitly. In sum, that statistical evidence can be relevant in determining whether an employer's past practice is discriminatory is not equivalent to concluding that the absence of proportionality makes out discrimination.

\* \* \*

Accordingly, we deny the Commission's petition.