**LUTHERAN CHURCH–MISSOURI SYNOD, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Missouri State Conference of Branches of the NAACP, et al., Intervenors.**

**No. 97–1116.**

United States Court of Appeals, District of Columbia Circuit.

Sept. 15, 1998.

Before: EDWARDS, Chief Judge, WALD, SILBERMAN, WILLIAMS, GINSBURG, SENTELLE, HENDERSON RANDOLPH, ROGERS, TATEL and GARLAND, Circuit Judges.

A statement by Chief Judge HARRY T. EDWARDS, with whom WALD, Circuit Judge, concurs, dissenting from the denial of the suggestions of rehearing en banc is attached.

A statement filed by Circuit Judge TATEL, with whom WALD, Circuit Judge, concurs, dissenting from the denial of the suggestions of rehearing en banc is also attached.

Circuit Judge ROGERS would grant the suggestions of rehearing en banc.

Circuit Judge GARLAND did not participate in this matter.

## ON SUGGESTIONS OF REHEARING EN BANC

### ORDER

PER CURIAM.

Respondent's and Intervenor's Suggestions of Rehearing *En Banc* and the response thereto have been circulated to the full court. The taking of a vote was requested. Thereafter, a majority of the judges of the court in regular active service did not vote in favor of the suggestions. Upon consideration of the foregoing, it is

ORDERED that the suggestions be denied.

HARRY T. EDWARDS, Chief Judge, dissenting from the denial of rehearing en banc:

By subjecting an agency's nonpreferential antidiscrimination policies to scrutiny appropriate only for racial classifications, the panel in this case has created a constitutional issue where none exists.

At issue are equal employment opportunity regulations promulgated by the Federal Communications Commission ("Commission" or "FCC"). The regulations prohibit discrimination in employment. *See* 47 C.F.R. § 73.2080(a) (1997). The regulations also require broadcast stations to maintain "a positive continuing program of specific practices designed to ensure equal opportunity in every aspect of station employment policy and practice." 47 C.F.R. § 73.2080(b). In particular, broadcasters are required to make sure that managers, employees, and prospective employees are fully apprised of the equal employment opportunity policy; in addition, broadcasters are required to "conduct continuing review of job structure and employment practices" to ensure equal employment opportunity. *Id.* Finally, under "EEO program requirements," broadcasters are instructed that, "to the extent possible, and to the extent that they are appropriate in terms of the station's size, location, etc.," a broadcaster should consider the following actions to facilitate equal employment opportunity:

. . . .

(1) Disseminate its equal opportunity program to job applicants and employees. For example, this requirement may be met by:

(i) Posting notices in the station's office and other places of employment, informing employees, and applicants for employment, of their equal employment opportunity rights. Where it is appropriate, such equal employment opportunity notices should be posted in languages other than English;

(ii) Placing a notice in bold type on the employment application informing prospective employees that discrimination because of race, color, religion, national origin, or sex is prohibited;

(iii) Seeking the cooperation of labor unions, if represented at the station, in the implementation of its EEO program and the inclusion of nondiscrimination provisions in union contracts;

(iv) Utilizing media for recruitment purposes in a manner that will contain no indication, either explicit or implicit, of a preference for one sex over another and that can be reasonably expected to reach minorities and women.

(2) Use minority organizations, organizations for women, media, educational institutions, and other potential sources of minority and female applicants, to supply referrals whenever job vacancies are available in its operation. For example, this requirement may be met by:

(i) Placing employment advertisements in media that have significant circulations among minorities residing and/or working in the recruiting area;

(ii) Recruiting through schools and colleges, including those located in the station's local area, with significant minority-group enrollments;

(iii) Contacting, both orally and in writing, minority and human relations organizations, leaders, and spokesmen and spokeswomen to encourage referral of qualified minority or female applicants;

(iv) Encouraging current employees to refer minority or female applicants;

(v) Making known to recruitment sources in the employer's immediate area that qualified minority members and females are being sought for consideration whenever you hire and that all candidates will be considered on a nondiscriminatory basis.

(3) Evaluate its employment profile and job turnover against the availability of minorities and women in its recruitment area. For example, this requirement may be met by:

(i) Comparing the composition of the relevant labor area with composition of the station's workforce;

(ii) Where there is underrepresentation of either minorities and/or women, examining the company's personnel policies and practices to assure that they do not inadvertently screen out any group and take appropriate action where necessary. Data on representation of minorities and women in the available labor force are generally available on a metropolitan statistical area (MSA) or county basis.

(4) Undertake to offer promotions of qualified minorities and women in a nondiscriminatory fashion to positions of greater responsibility. For example, this requirement may be met by:

(i) Instructing those who make decisions on placement and promotion that qualified minority employees and females are to be considered without discrimination, and that job areas in which there is little or no minority or female representation should be reviewed;

(ii) Giving qualified minority and female employees equal opportunity for positions which lead to higher positions. Inquiring as to the interest and skills of all lower paid employees with respect to any of the higher paid positions.

(5) Analyze its efforts to recruit, hire, and promote minorities and women and address any difficulties encountered in implementing its equal employment opportunity program. For example, this requirement may be met by:

(i) Avoiding use of selection techniques or tests that have the effect of discriminating against qualified minority groups or females;

(ii) Reviewing seniority practices to ensure that such practices are nondiscriminatory;

(iii) Examining rates of pay and fringe benefits for employees having the same duties, and eliminating any inequities based upon race or sex discrimination.

47 C.F.R. § 73.2080(c).

The Commission also utilizes internal guidelines for processing license renewal applications. Under these guidelines, when deciding how closely to examine compliance with equal opportunity regulations by a station employing between five and fifty full-time employees, the Commission will consider the ratio of minority and women employees to the available workforce as one of several factors. *See Amendment of Part 73,* 2 F.C.C.R. 3967, ¶ 45 (1987); *EEO Processing Guidelines for Broadcast Renewal Applicants,* 46 RR 2d 1693 (1980).

It seems to me that the challenged regulations command virtually nothing, save good faith efforts by broadcasters to ensure against unlawful employment discrimination. This notwithstanding, the panel somehow viewed the FCC regulations as "certainly influenc[ing] ultimate hiring decisions" and "oblig[ing] stations to grant some degree of preference to minorities in hiring." *See Lutheran Church–Missouri Synod v. FCC,* 141 F.3d 344, 351 (D.C.Cir.1998). Accordingly, the panel concluded that the regulations constituted the kind of racial classification that must be subjected to strict scrutiny under *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). *See* 141 F.3d at 351. This analysis mischaracterizes the regulations, with serious consequences.

The regulations in no way draw any kind of racial classification. They plainly do not "oblige" anyone to exercise any sort of hiring preference. Rather, the regulations merely facilitate the avoidance of unlawful employment discrimination. The regulations "influence" hiring decisions only in the sense that anti-discrimination law generally seeks to in-

fluence employers to avoid bias. Therefore, I cannot understand how it can be concluded that the regulations constitute a racial classification. Because there is no racial classification at issue here, there is no real constitutional issue to be decided in this case.

\* \* \*

Because the panel decision purports to decide major issues of constitutional law where none exist, this case "presents questions of 'real significance to the legal process as well as to the litigants,' " *Bartlett v. Bowen,* 824 F.2d 1240, 1244 (D.C.Cir.1987). Thus, in my view, review by the full court is required.

\* \* \*

Under *Adarand,* the existence of "racial classification" in a federal statute triggers strict scrutiny. *See Adarand,* 515 U.S. at 227, 115 S.Ct. 2097. It is clear that *Adarand,* which consistently used the language of "racial classification," *see id.* at 215, 223, 224, 227, 115 S.Ct. 2097, dealt only with policies that actually classified on the basis of race. A careful look at the regulations here reveals that they do not include any such classification, and that *Adarand* therefore does not apply to them.

The panel here found that the Commission's regulations constituted a racial classification under *Adarand,* because, in the panel's view, "[t]he entire scheme is built on the notion that stations should aspire to a workforce that attains, or at least approaches, proportional representation." 141 F.3d at 351–52. In so finding, the panel relied primarily on two pieces of evidence. The first was the regulations' requirement that stations evaluate themselves, and, when finding "underrepresentation" of minorities, determine whether their hiring policies "inadvertently" discriminated. *See* 47 C.F.R. § 73.2080(c)(3)(ii). The second piece of evidence, on which the panel relied heavily, was a set of processing guidelines that the FCC issued for internal review of licensing renewals. Under the guidelines, a station that did not meet certain numerical criteria could be subjected to closer review to determine equal opportunity compliance. *See Amendment of Part 73,* 2 F.C.C.R. 3967, ¶ 45 (1987); *EEO Processing Guidelines for Broadcast Renewal Applicants,* 46 RR 2d 1693 (1980). The

panel thought these guidelines offered an incentive to stations to employ hiring preferences. This incentive, the panel concluded, was encouragement sufficient to trigger strict scrutiny.

The panel was undoubtedly correct in stating that regulations that *"oblige* stations to grant some degree of preference to minorities in hiring" would constitute a racial classification and would trigger strict scrutiny. *See* 141 F.3d at 351 (emphasis added). The serious problem with the panel's analysis, however, is that the regulations here do not "oblige" anyone to exercise any preference. The most they do, even arguably, is to *encourage stations fairly to consider minority applications.* Instructing stations to use statistical analysis as one possible method of checking themselves for unintentional discrimination could not conceivably be understood as "obliging" or "encouraging" the use of any preference. It simply advises a method for increasing vigilance against discrimination. The processing guidelines, for their part, clearly do not require that a station exercise a racial hiring preference, but only set the conditions under which some further inquiry into a station's hiring practices might occur.

The panel claimed that the mere possibility that the racial composition of a station's workforce might play a role in subjecting a station to the burden of a "government audit" makes the guidelines into a preferential racial classification. But this argument makes no sense in light of decisions, such as *Texas Dep't Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 · S.Ct. 1089, 67 L.Ed.2d 207 (1981) (test for prima facie case with respect to a disparate treatment claim under Title VII) and *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) (non-proportionality in the selection process can be the basis of a "disparate impact" claim under Title VII), setting forth the standards governing the establishment of a *prima facie* case of employment discrimination under Title VII. *See also* 42 U.S.C. § 2000e–2(k) (1994) (setting forth burden of proof in disparate impact cases). The *Burdine* and disparate impact frameworks show definitively that no suspect "racial classifica-

tion" need arise simply because the law dictates that an employer might have to explain; on pain of sanction, why its hiring decisions were nondiscriminatory.

Under *Burdine,* when a protected *minority* plaintiff shows by a preponderance of the evidence that he or she was denied employment despite being qualified, and that the position remained unfilled, the burden of production shifts to the employer-defendant to show that the hiring decision was nondiscriminatory. *See* 450 U.S. at 253–54, 101 S.Ct. 1089. In other words, *Burdine* allows the race of just one applicant to play a crucial, even determinative, part in requiring an employer to respond in litigation and justify its actions. "[T]he prima facie case 'raises an inference of discrimination only because *we presume these acts, if otherwise unexplained,* are more likely than not based on the consideration of impermissible factors.'" *Id.* at 254 (emphasis added) (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)).

As the Supreme Court noted in establishing this framework, "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. Yet, the *Burdine* framework certainly does not implicate strict scrutiny. The FCC's processing guidelines use race in an even less instrumental way: a numerical disparity between a station's employees and the relevant workforce is simply one factor among several in the Commission's determination of whether further investigation (not litigation) is required.

In light of the statutory mandates that we routinely enforce under Title VII, both with respect to "disparate treatment" and "disparate impact" cases, *see, e.g., Koger v. Reno,* 98 F.3d 631, 633–34, 639 (D.C.Cir.1996) (applying and explaining disparate treatment and disparate impact standards), it is hard to comprehend a suggestion that the disputed FCC guidelines and regulations implicate strict scrutiny. A race-based analysis may play a part in the Commission's decision to launch an investigation to which a station would have to respond. But it does not follow that the burden of a potential investi-

gation "obliges" a station to engage in unlawful hiring preferences, any more than the *Burdine* burden-shifting obliges employers generally to engage in preferential hiring in order to avoid ever facing the requirement of justifying their employment decisions as nondiscriminatory. Plainly, race may be a factor in requiring a party to explain its actions without triggering strict scrutiny.

In the opinion denying the petition for rehearing, the panel suggests that the analogy to Title VII is inapposite, because "the statute does not encourage employers to impose racial preferences in order to avoid Title VII liability." The same can be said here about the regulations and processing guidelines, for neither requires nor encourages employers to exercise racial hiring preferences. The panel decision on rehearing seeks to avoid the analogy to Title VII by citing a provision in the statute that says, "[n]othing contained in [Title VII] shall be interpreted to require any employer ... to grant preferential treatment to any individual or to any group because of [ ] race...." *See* 42 U.S.C. § 2000e–2j (1994). I take it from this that the Commission's regulations would have survived judicial scrutiny had the agency foreseen the need to parrot this passage from Title VII. When the case is returned to the agency, the Commission should consider amending the regulations to add the Title VII caveat. It seems obvious to me that the regulations and guidelines as presently written do not require or encourage racial preferences, but, if that point needs further clarification, it is easily achieved.

The panel decision seems to be of the view that any policy that leads an employer to be conscious of race while making hiring decisions demands strict scrutiny. I think this is incorrect as a matter of law and logic: a person who is being scrupulously and self-consciously careful *not* to be racist in a hiring decision is certainly "conscious of" race—but in a positive way. To think otherwise is to confuse the aspiration to color-blindness with the reality that today, whether we like it or not, "race" exists as a social fact. If Congress passed a law stating that every federal employer must think twice before every hiring decision to make sure he or she was not

making a racist decision, this law surely would not implicate strict scrutiny, even though it would call for self-consciousness about race.

Indeed, the processing guidelines may not even aim to affect the stations' behavior at all: the guidelines reasonably can be understood to provide nothing more than a method for allocating the agency's investigative resources. It is hard to see how strict scrutiny should apply to the guidelines an agency uses to decide when to look closely at whether its licensees are complying with the law. This is especially true when no infringement on the rights of the licensee is implicated by the closer investigation. The Commission cannot investigate every station in the country to see if it is discriminating in its hiring. The agency must allocate its investigative resources somehow. One inexpensive, nondiscriminatory way for it to make the initial cut is to look at the numbers of minorities hired relative to the number of minorities in the general area. That is all that the processing guidelines actually do.

Because there is no racial classification in these guidelines or regulations, *Adarand* does not apply. The panel's constitutional analysis was therefore entirely unwarranted. The panel here essentially disagreed as a matter of policy with the use of statistical comparison as a method of targeting more careful investigation. There may be reasons for such a disagreement, but they are not of constitutional magnitude. Because *Adarand* simply does not cover this case, its application—which allows the panel to second-guess the Commission on agency policies—is misplaced.

\* \* \*

Beyond its misapplication of *Adarand* to the regulations and guidelines at issue in this case, the panel here subjected the term "diversity" to a rhetorical attack which, in my view, misstated the limited way in which the concept of "diversity" functions in this case. *See* 141 F.3d at 356. Depending on context, the term "diversity" can have several meanings, only one of which actually applies here. The only meaning that might be relevant here is that of "programming diversity," the justification offered by the Commission for

its equal employment opportunity regulations, endorsed by the Supreme Court in *Metro Broad., Inc. v. FCC*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), and not overruled by the Court in *Adarand.*

A second, largely unrelated meaning of "diversity," is the use of racial and gender diversity in the workplace as either a relevant datum for making an initial determination of whether employment discrimination is occurring, or, alternatively, as a tool for promoting important social goals. This second type of diversity is not at issue in this case, because the Commission has not cited workplace diversity *in itself* as its justification for equal employment opportunity programs.

Unfortunately, the panel decision seems to conflate the several meanings of "diversity." The panel decision thus broadly deplores the

> burden the term 'diversity' has been asked to bear in the latter part of the 20th century in the United States[,] [claiming that] it appears to have been coined both as a permanent justification for policies seeking racial proportionality in all walks of life ("affirmative action" has only a temporary remedial connotation) and as a synonym *for proportional representation itself.*

141 F.3d at 356. This argument may be relevant to the ongoing debates in our society over "affirmative action;" but I do not understand what this message has to do with the instant case.

The panel decision does not appear to doubt for an instant that, absent the suggestion that the disputed regulations constitute a "racial classification," there is no real constitutional issue at stake here. The panel's references to "strict scrutiny" and "intermediate scrutiny," 141 F.3d at 356, are irrelevant, because there is no "racial classification" at issue. Indeed, given the truly innocuous nature of the regulations, proponents of affirmative action might be surprised by the suggestion that the FCC equal employment opportunity program is seen by some as affording racial preferences. In my view, it just isn't so.

This court hears and decides garden-variety challenges to the logic of agencies' justifications for their actions every day without

reaching constitutional questions. If the Commission failed adequately to explain or justify its equal employment opportunity program as applied to the station here, the proper initial review should have proceeded according to our ordinary standards. If the parties failed to join the issue correctly, the court should still have declined to address an overreaching constitutional challenge. By forcing the square peg of the Commission's regulations into the round hole of the *Adarand* analysis, which applies only to racial classifications, the panel decision disserves the development of antidiscrimination doctrine. This serious misprision of the issues calls for rehearing *en banc*.

TATEL, Circuit Judge, dissenting from the denial of rehearing en banc:

Although the Supreme Court has gradually limited governmental affirmative action, applying strict scrutiny first to state and local programs in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), and then to federal programs in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), neither the Supreme Court nor any other court has ever applied strict scrutiny to programs that require nothing more than recruitment, outreach, self-evaluation, and data collection. Because the panel has done just that, taking *Adarand* where no court has yet taken it, and because the panel could have easily avoided the issue by granting the Commission's motion for partial remand of the record, this case involves "a question of exceptional importance" warranting *en banc* review. FED. R.APP. P. 35(a).

I

"[N]ovel!" or even "unusual" may well be appropriate descriptions of the Commission's motion to remand. *Lutheran Church–Missouri Synod v. FCC*, 141 F.3d 344, 349 (D.C.Cir.1998). But because remand would have mooted this case, thus avoiding the need to decide a major constitutional issue, the panel should have taken the Commission at face value and granted its motion. "If there is one doctrine more deeply rooted than any other in the process of constitution-

al adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944).

The Commission's motion stated that in light of its new *Order and Policy Statement* issued on February 25, 1998, it would "(1) vacat[e] those portions of the *Memorandum Opinion and Order*, the *Initial Decision* of the Administrative Law Judge and the *Decision* of the Review Board that relate to the EEO issue designated for hearing in this proceeding, and (2) unconditionally grant[ ] the Church's applications for renewal of its broadcast licenses at issue here." Mot. Partial Remand at 1. According to the Commission, this would have "moot[ed] all issues in this case" except the lack of candor issue, *id.* at 2—a question which was not, as the Church claims, "inextricably related" to the affirmative action issue, Opp'n Pets. Reh'g and Suggestions for Reh'g In Banc at 5, but which instead turned solely on whether the Church had accurately characterized its own hiring policies. Commission counsel's subsequent notification to the panel that one Commissioner would not agree to this result in no way undermined the Commission's commitment to vacate its order.

To be sure, the Commission found the Church's conduct defective independently of the Church's Lutheran preference, and the Commission's EEO requirements will still apply to the Church's future outreach and self-evaluation efforts. But none of this is relevant in light of the Commission's declaration that it would vacate all portions of its order dealing with the Church's EEO violations and unconditionally grant the Church's license renewal. Were the panel to have remanded, and were the Commission to make an issue of the Church's compliance in a future enforcement proceeding, nothing would prevent the Church from challenging the constitutionality of the EEO requirements at that time.

I acknowledge that the Commission's request came well after oral argument took place, and that in some cases we have held that late filing of such motions precludes remand. *See Mississippi River Transmis-*

*sion Corp. v. FERC,* 969 F.2d 1215, 1217 n. 2 (D.C.Cir.1992) (motion filed without request for leave to file two days before oral argument). But late filing made no difference in *Steele v. FCC,* 770 F.2d 1192 (D.C.Cir.1985), *vacated, Steele v. FCC,* No. 84–1176 (D.C.Cir. Oct 31, 1985) (en banc), where, as described in *Lamprecht v. FCC,* this court remanded an affirmative action case to the FCC not only after a panel had issued a decision, but after the full court vacated the panel decision to rehear the case *en banc. See* 958 F.2d 382, 385 (D.C.Cir.1992) (discussing *Steele*). In its remand motion in *Steele,* the Commission "acknowledged that it thought its race- and sex-preference policies contrary to both the Communications Act and the Constitution" and advised the court that it wanted to reconsider those policies. *Id.*

The panel points out that in *Steele* the Commission's motion to remand was supported by the party who had challenged the policy. *See Luthern Church–Missouri Synod v. FCC,* 154 F.3d 487, 489 (D.C.Cir.1998). However, I know of no authority supporting the proposition that our deeply rooted obligation to avoid unnecessarily adjudicating constitutional questions evaporates simply because the party that brought the case desires a decision on the merits. Nor is such a notion consistent with Supreme Court precedent. For example, in *Richardson ·v. Wright,* 405 U.S. 208, 92 S.Ct. 788, 31 L.Ed.2d 151 (1972) (per curiam), the Court, having been notified "[s]hortly before oral argument" that the agency had adopted new regulations, ruled that "the appropriate course is to withhold judicial action pending reprocessing, under the new regulations," because if petitioner were to prevail, "there will be no need to consider the constitutional claim." *Id.* at 209, 92 S.Ct. 788. The Court reached this conclusion *"sua sponte," id.* at 212, 92 S.Ct. 788 (Brennan, J., dissenting), suggesting that the Justices gave respondent no opportunity to express its view on the matter prior to remand. Remand would have been equally appropriate here to avoid deciding a major constitutional issue, particularly because the Commission has not just issued a binding order changing its policies, *see In re Streamlining Broad. EEO Rule and Policies,* 13 F.C.C.R. 6322 ¶ 3 (1998)

("This action should be considered binding for radio licensees and permittees . . . ."), but also stated its intent to apply the new policies to the Church's case on remand, thus granting it complete relief on the EEO issue.

## II

Turning to the merits, I find nothing in *Adarand* or any other affirmative action case decided by the Supreme Court that supports the panel's application of strict scrutiny to the Commission's EEO regulations. The panel relies on *Adarand* for the proposition that strict scrutiny applies to all governmental racial classifications, but a careful reading of *Adarand* demonstrates that the target of strict scrutiny is "any racial classification subjecting [a] person to *unequal treatment.*" 515 U.S. 200, 224, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (emphasis added). Not only does the language of *Adarand* make clear that its precise concern is governmental action that "treat[s] people differently because of their race," *id.* at 227, 115 S.Ct. 2097; *see also id.* at 228, 115 S.Ct. 2097 (strict scrutiny applies to "unequal treatment based on race"), but the facts of *Adarand* presented the Court with a racial classification that squarely produced unequal treatment: *Adarand* involved a government program that gave financial bonuses to contractors who utilized minority subcontractors, thus directly enhancing the competitive position of minority-owned firms relative to non-minority-owned firms in bidding for subcontracts. *See id.* at 205–10, 115 S.Ct. 2097.

In each major affirmative action case discussed in *Adarand,* moreover, unequal treatment based on race served as the trigger for strict scrutiny. In *City of Richmond v. J.A. Croson Co.,* city policy required prime contractors to subcontract at least 30 percent of the contract award to minority-owned businesses. *See* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). In *Wygant v. Jackson Board of Education,* a school board used racial preferences in determining which teachers to lay off. *See* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). And in *Regents of University of California v. Bakke,* a state medical school reserved 16 out of 100 places in the entering class for minority students and evaluated minority applicants

through a separate process using admissions criteria different from those used for white applicants. *See* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).

Properly read, therefore, *Adarand* does not require strict judicial scrutiny of *all* race-conscious measures adopted by the government. Indeed, a vast range of antidiscrimination laws, including Title VII, require public and private entities to be conscious of race not only in outreach and recruitment, but also in hiring and promotion. Surely such laws do not implicate strict scrutiny. What triggers strict scrutiny, then, is not mere race-consciousness, but rather unequal treatment based on race.

In this case, I am at a loss to understand how the Commission's regulations give rise to unequal treatment based on race. By their own terms, the regulations require no "use[ ] of race in governmental decisionmaking," as in *Adarand*, 515 U.S. at 228, 115 S.Ct. 2097. Instead, they merely require broadcasters to eliminate discriminatory practices, to expand the pool from which they hire, and to keep adequate records. Nothing in the regulations' outreach provisions, *see* 47 C.F.R. § 73.2080(c)(2) (1997) (requiring stations to target sources for minority applicants); *id.* § 73.2080(c)(5) (requiring stations to analyze their efforts to recruit, hire, and promote minorities), either directs stations to hire anyone on the basis of race or requires stations to maintain any specific racial balance. Nor do the regulations confer or withhold benefits upon anyone on racial grounds. The regulations simply require that "licensees make efforts to recruit minority and women applicants so that they will be ensured access to the hiring process." *In re Benchmark Radio Acquisition Fund IV Limited Partnership*, 11 F.C.C.R. 8547 ¶ 3 (1996). Indeed, nothing in the regulations prevents stations from evaluating job applicants solely on the basis of individual merit. At least one other court has characterized such outreach programs as race-neutral. *See Peightal v. Metropolitan Dade County*, 26 F.3d 1545, 1557–58 (11th Cir.1994) (describing school recruitment programs targeted at minorities and outreach programs led by minority employees as race-neutral).

The panel responds by pointing out that the regulations in *Adarand*, like the Commission's regulations here, "did not require or obligate" private entities to adopt a racial preference, but merely "provided a financial incentive to bidding contractors to grant such a preference." 154 F.3d at 491. "Nonetheless," according to the panel, "the Supreme Court treated the regulations as a racial classification, and did not even pause to consider the suggestion that the absence of a *compelled* racial preference makes strict scrutiny inapposite." *Id.* In *Adarand*, however, the core of the equal protection challenge was not that the system of bonuses provided an incentive for prime contractors to grant a racial preference in subcontracting, but that the bonuses directly put minority-owned subcontractors in a more competitive bidding position than non-minority-owned subcontractors. *Adarand* would control this case if the Commission's regulations put minority job applicants in a better position than non-minority applicants. But the regulations do no such thing. Indeed, they do not even offer incentives for licensees to prefer minority over non-minority job applicants. Stations with *inadequate* outreach programs cannot protect themselves from enforcement actions by preferring minorities in order to meet the 50% parity goal. *See In re Kelly Communications, Inc.*, 12 F.C.C.R. 17,868 ¶¶ 11–13 (1997). And stations with *adequate* outreach programs face no sanctions for failing to reach specific numerical levels of minority hiring. *See In re Louisiana Broadcast Stations*, 7 F.C.C.R. 1503 ¶¶ 16–19 (1992) (holding that station complied with EEO rule based on its minority recruitment efforts despite failing to hire any minorities); *In re Miami Broadcast Stations*, 5 F.C.C.R. 4893 ¶¶ 13–17 (1990) (holding that station complied with EEO rule despite statistical disparity between new minority hires and minorities in local labor force, and declaring that "failing to meet the Commission's processing guidelines does not in and of itself demonstrate the inadequacy of a licensee's EEO efforts. The Commission instead focuses on a station's overall efforts to recruit, hire and promote minorities.") (citation omitted). Because minority hiring is neither necessary nor sufficient for a finding

of compliance with the Commission's regulations, I find it difficult to understand how the panel could have concluded that the regulations "indisputably" encourage licensees to use racial hiring preferences. Simply put, the regulations here do not produce the kind of direct discriminatory treatment that occurred in *Adarand, Croson, Wygant,* or *Bakke.*

All but conceding that the regulations by their terms mandate no hiring preferences, the panel, pointing to the requirement that stations evaluate their employment profile against the availability of women and minorities in their recruiting areas, *see* 47 C.F.R. § 73.2080(c)(3), insists that the EEO regulations "certainly influence ultimate hiring decisions." *Lutheran Church–Missouri,* 141 F.3d at 351. But nothing in the record supports this assumption; indeed, the Church does not even claim that the regulations "influence" its hiring decisions.

The panel says that because "evidence of actual discrimination would not be required before applying strict scrutiny" in cases involving racial quotas, "there is no logical reason why it should be required here." 154 F.3d at 492. While it is certainly true that courts have not required evidence of discrimination before applying strict scrutiny in quota cases, the reason is not that they view it as irrelevant or unnecessary, but rather that in such cases the connection between the regulatory requirements and the resulting unequal treatment has always been so obvious and well-documented that an overt evidentiary requirement would be superfluous. *See, e.g., Croson,* 488 U.S. at 481–83, 109 S.Ct. 706

(documenting the differential treatment of minority versus non-minority subcontractors under Richmond's set-aside requirement); *Wygant,* 476 U.S. at 270–72, 106 S.Ct. 1842 (documenting the differential treatment of minority versus non-minority teachers under the Jackson Board's layoff policy); *Bakke,* 438 U.S. at 272–78, 98 S.Ct. 2733 (documenting the differential treatment of minority versus non-minority applicants under the Davis medical school's racial quota). Given the evidence of discriminatory treatment in *Croson, Wygant,* and *Bakke,* I do not agree that requiring evidence of discrimination in this case would "turn equal protection analysis inside out." 154 F.3d 492. Den. Reh'g at 9. I know of no equal protection case in which a court has shifted the burden of justifying a regulatory scheme to the government without first determining that the scheme has actually effected some form of unequal treatment. Where, as here, the existence of discriminatory treatment is far from obvious, we should insist on something more than unsupported speculation about the effect of challenged regulations before subjecting them to strict scrutiny.

I respectfully dissent from the denial of the suggestions for rehearing *en banc.*